3 P.3d 535

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Zdenek Gusdav KONECHNY,**
**Defendant–Appellant.**

No. 25384.

Court of Appeals of Idaho.

June 1, 2000.

Lynn, Scott, Hackney & Jackson, Boise, for appellant. J. Gardiner Hackney Jr. argued.

Hon. Alan G. Lance, Attorney General; Karen A. Hudelson, Deputy Attorney General, Boise, for respondent. Karen A. Hudelson argued.

LANSING, Judge.

The principal issue in this case concerns the evidentiary foundation that must be laid for the admission of a mental health profes-

sional's opinion that a child has been subjected to sexual abuse. Because we conclude that such testimony was admitted in this case without an adequate foundation to show either the witnesses' qualifications to render such opinions or the reliability of their opinions, we vacate the judgment of conviction and remand the case for a new trial.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Zdenek Gusdav Konechny was charged with two counts of lewd and lascivious conduct with a child under sixteen, Idaho Code § 18–1508, based upon the allegations of his stepdaughters, A.B. and C.D.[1] A.B. was five years old and C.D. was seven years old at the time of the alleged offenses. In December 1997, while A.B. and C.D. were visiting their natural father and his family, the girls disclosed to their fifteen-year-old stepsister that Konechny had inappropriately touched them. According to A.B. and C.D., Konechny had on several occasions, while alone with them, manually touched them on their genitalia. The police were contacted on the day of disclosure, and the children subsequently participated in a number of interviews at the Children at Risk Evaluation Services (CARES) agency.

Konechny denied the charges, and a jury trial was conducted. During the trial, the State's witnesses included two counselors, Heidi Hart and Penny McKay, each of whom had treated one of the claimed victims. The counselors were allowed to testify, over Konechny's objection, that the girls had been sexually abused. Hart, who was C.D.'s counselor, testified as follows:

Q: This opinion that you have with regard to [C.D.], whether or not she's been a victim of sexual abuse, what is your opinion?

[Defense objection overruled.]

A: I believe that C.D. is a victim of sexual abuse.

Q: What is that based upon?

A: That is based upon reading the CARES interview and her disclosure there and my time with [C.D.] in our sessions and being able to talk with primarily the father who is the one that has transported her to the sessions, so what he's observing, and periodically phone calls with the mother.

Counselor McKay, who had been treating A.B., also rendered an opinion that sexual abuse had occurred:

Q: Basically from your visits with [A.B.] and your training and experience, do you have an opinion on whether or not you believe she was the victim of sexual abuse?

A: Yes.

[Defense objection overruled.]

Q: What's that based upon?

A: Based upon my experience, my training and the consistency of the child.

Q: Over the sessions that you have had with her?

A: Yes.

Q: What is your opinion?

A: That she was sexually abused.

The jury found Konechny guilty of both counts, and the district court sentenced him to concurrent unified sentences of ten years, with two-year minimum terms of incarceration. On appeal, Konechny raises a number of challenges to the district court's decisions admitting and excluding evidence at trial, including the district court's decision overruling Konechny's objections to the testimony of the counselors.

## II.

### ANALYSIS

**A. Admission of Opinion Testimony of State's Experts**

Konechny asserts that the foundation for the counselors' testimony was inadequate with respect to both the qualifications of the witnesses as experts and the scientific bases

---

1. Because of the similarity of the girls' names, we cannot distinguish them by use of their real initials. Therefore, we use fictitious initials to refer to the alleged victims.

for their opinions.[2] When a trial court's decision to admit or exclude expert testimony is challenged on appeal, we review the decision for an abuse of discretion. *State v. Merwin*, 131 Idaho 642, 645–46, 962 P.2d 1026, 1029–30 (1998); *State v. Winn*, 121 Idaho 850, 855, 828 P.2d 879, 884 (1992); *State v. Dragoman*, 130 Idaho 537, 542, 944 P.2d 134, 139 (Ct. App.1997).

■ The Idaho Supreme Court has held that "an expert can render an opinion that a child has been sexually abused if he is qualified by knowledge, skill, experience, training, or education." *State v. Hester*, 114 Idaho 688, 692, 760 P.2d 27, 31 (1988). *See also State v. Lewis*, 123 Idaho 336, 351, 848 P.2d 394, 409 (1993). However, on several occasions both the Supreme Court and this Court have held that such opinions were not admissible because the witness's testimony lacked a demonstration of either the requisite expertise on the part of the witness or a reliable basis for the opinion or both. *See State v. Zimmerman*, 121 Idaho 971, 978, 829 P.2d 861, 868 (1992); *State v. Pugsley*, 128 Idaho 168, 175–76, 911 P.2d 761, 768–69 (Ct.App. 1995); *State v. Allen*, 123 Idaho 880, 884, 853 P.2d 625, 629 (Ct.App.1993); *State v. Johnson*, 119 Idaho 852, 857, 810 P.2d 1138, 1143 (Ct.App.1991). The issues raised by Konechny's appeal require that we now examine and express with more specificity the foundational prerequisites for the admission of an expert's opinion that a child has been sexually abused.

## 1. Qualifications of the State's expert witnesses

We consider first Konechny's challenge to the qualifications of Hart and McKay to render opinions as to whether a child has been sexually abused.

■ The admissibility of expert testimony is governed by Idaho Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

This rule requires that an expert be "qualified." The five sources of expert qualifications identified in the rule, knowledge, skill, experience, training, or education, are disjunctive. *State v. Hopkins*, 113 Idaho 679, 681, 747 P.2d 88, 90 (Ct.App.1987). Therefore, academic training is not always a prerequisite to be qualified as an expert; practical experience or specialized knowledge may be sufficient. *West v. Sonke*, 132 Idaho 133, 139, 968 P.2d 228, 234 (1998); *Hopkins, supra*. However, there must be some demonstration that the witness has acquired, through some type of training, education or experience, the necessary expertise and knowledge to render the proffered opinion.

In this case, the State provided little in the way of foundational information to qualify the counselors as expert witnesses in the field of diagnosing child sexual abuse, i.e., determining whether a child has in fact been subjected to sexual molestation. Hart testified that she had a bachelor's degree in an unspecified field and had received a master's degree in education. She had been licensed as a counselor since 1994. After an internship at the Sexual Abuse Now Ended (SANE) program, Hart began working there full time in 1994. She briefly described her work experience at SANE as including the treatment of adult sex offenders and the assessment of juvenile offenders in preparation for trial. At the time of Konechny's trial, Hart's work focused on counseling victims of sexual abuse. She had attended 350

---

**2.** The State has asserted that Konechny did not preserve these issues by making adequate objections below. However, an oral motion in limine was offered by Konechny's counsel prior to the testimony. In the motion, counsel argued that the proposed testimony of the witnesses would be improper expert opinion and would go to the ultimate issue to be decided by the jury. The district court did not rule on the motion, but instead suggested that defense counsel examine Idaho case law on the requirements for admissible expert testimony. Konechny's trial counsel renewed the objections and challenged the witnesses' qualifications as experts when they were asked for their opinions as to whether their respective clients had been sexually abused. The motion in limine and objections preserve the issues for our review.

hours of conferences dealing with the treatment of sexual abuse and had conducted twenty-four counseling sessions with C.D. At no point during her testimony did Hart detail any training, experience, skill, knowledge, or education in *identifying* or *diagnosing* children who have been subjected to sexual abuse. To the contrary, the foundational evidence presented only a background in *counseling* or *treatment.*

We recognize that there is overlap between the realms of psychological diagnosis and treatment. However, the two roles are not identical and do not inherently call for the same skills. Indeed, a number of courts and scholarly publications have suggested that the roles of therapist and forensic diagnostician should not be served by the same person. According to Lisa R. Askowitz & Michael H. Graham, *The Reliability of Expert Psychological Testimony in Child Sexual Abuse Prosecutions,* 15 CARDOZO L. REV.2027 (1994), one common concern about utilizing a therapist as an expert diagnostic witness stems from a mental health professional's training "to rely heavily on the reported feelings of the child and to base therapy on an assumption that abuse has occurred." *Id.* at 2091. The authors continue:

> Mental health professionals who enter the forensic arena . . . are asked to shift from their more familiar role as the child's helping agent and instead seek to uncover truth, whatever its implications for the child's treatment. The mental health professional thus becomes a potential adversary to the child, and his or her engrained tendency to support or empathize may cloud objectivity.

The American Academy of Child and Adolescent Psychiatry suggests that the mental health professional who seeks to determine whether a child has been abused for forensic purposes and the professional who treats the child should be two different individuals in order to clarify roles and preserve confidentiality in treatment. In contrast to the role of the child's therapist, it is the job of the evaluator to look for the objective truth by collecting extensive data from all parties in the case without concern for the psychological impact of his or her testimony on the parties. Although mental health professionals try to avoid dual relationships in the same case, more and more treating clinicians are subpoenaed to testify for the prosecution in child sexual abuse prosecutions. It is imperative that prosecutors, defense attorneys, and judges understand the differences between these two distinct roles.

*Id.* at 2092 (quotation marks and footnotes omitted). *See also Guidelines for the Clinical Evaluation of Child and Adolescent Sexual Abuse,* 27 J. AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY 655 (1988) (hereinafter *Guidelines for the Clinical Evaluation of Children* ) ("The evaluator and the child's or adolescent's therapist should be two different individuals. This clarifies roles and preserves confidentiality in treatment."); Lynne Celander DeSarbo, Comment, *The Danger of Value–Laden Investigation in Child Sexual Abuse Cases: Are Defendants' Constitutional Rights Violated When Mental Health Professionals Offer Testimony Based On Children's Hearsay Statements and Behaviors,* 2 U. PA. J. CONST. L. 276, 290 (1999) ("Conflating the therapeutic and investigative roles fulfilled by [mental health professionals] . . . may interfere with the fair prosecution of alleged child sexual abusers."). The separation of the therapeutic and investigative roles is suggested as a means of "enhancing the reliability of the investigative process" and "[enabling] therapists to concentrate upon their critical mission—to help the child—unfettered by concerns of maintaining objectivity." DeSarbo, *supra.*

Courts faced with challenges to the expert opinions of mental health professionals in abuse cases have sometimes expressed similar concerns. *See, e.g., State v. Moran,* 151 Ariz. 378, 728 P.2d 248, 255 (1986) (prohibiting psychological testimony that the victim had been molested because "[p]sychologists and psychiatrists are not, and do not claim to be, experts at discerning truth. Psychiatrists are trained to accept facts provided by their patients, not to act as judges of patients' credibility."); *People v. Bledsoe,* 36 Cal.3d 236, 203 Cal.Rptr. 450, 681 P.2d 291, 300 (1984) ("[A]s a rule, rape counselors do not probe inconsistencies in their clients' descriptions of the facts of the incident, nor do

they conduct independent investigations to determine whether other evidence corroborates or contradicts their clients' renditions. Because their function is to help their clients deal with the trauma they are experiencing, the historical accuracy of the clients' descriptions of the details of the traumatizing events is not vital in their task."); *Hellstrom v. Commonwealth*, 825 S.W.2d 612, 614 (Ky. 1992) (finding the State's expert, the director of the Child Abuse Center at the University of Kentucky Medical Center, to be "well trained and experienced as a social worker" but unqualified as a diagnostician because social workers are generally trained to accept the facts offered by their client, the victim, in the pursuit of treating the victim); *State v. Rimmasch*, 775 P.2d 388, 407 (Utah 1989) ("Working hypotheses relied upon by therapists may be useful for treatment purposes; however, that does not mean that they are reliable enough to be used for forensic purposes.").

■ We do not hold that an alleged victim's treating therapist or counselor may never testify to an opinion as to whether sexual abuse has occurred. We do hold, however, that a foundational showing of expertise to render such an opinion requires more than general education and experience in mental health counseling. In *State v. J.Q.*, 130 N.J. 554, 617 A.2d 1196 (1993), the Supreme Court of New Jersey suggested a number of factors for a trial court to consider when evaluating the qualifications of an expert witness who will be asked to offer an opinion on the issue of sexual abuse.

> The expert must possess specialized knowledge of child development, individual and family dynamics, patterns of child sexual abuse, the disclosure process, signs and symptoms of abuse, and the use and limits of psychological tests. The expert [should be] familiar with the literature on child abuse, and understand[ ] the significance of developmentally inappropriate sexual knowledge. The expert [should be] able to interpret medical reports and laboratory tests. The expert also [should be] trained in the art of interviewing children, and [be] aware of the literature on coached and fabricated allegations of abuse. Of tre-

mendous importance is the expert's clinical experience with sexually abused children. 617 A.2d at 1202 (quoting 1 John E.B. Myers, *Evidence in Child Abuse and Neglect Cases* § 4.31, at 284–85). The American Academy of Child & Adolescent Psychiatry offers the following criteria for mental health professionals who evaluate a child for sexual abuse: "Clinicians performing these evaluations should possess sound knowledge of child development, family dynamics related to sexual abuse, effects of sexual abuse on the child, and the assessment of children, adolescents, and families. Furthermore, they should be trained in the diagnostic evaluation of both children and adults." *Guidelines for the Clinical Evaluation of Children, supra,* at 655. These suggested factors, though not exclusive, suggest the scope of the qualifications which trial courts should look for when a litigant offers an expert as a diagnostician of sexual abuse. In short, a foundation must be offered to show the witness's expertise not merely in treatment but in the determination whether the child was actually sexually abused.

■ In the case at bar, Hart may have received training or coursework in identifying children who were sexually abused during her collegiate years. Perhaps, some of the 350 hours of conferences she attended dealt with issues surrounding the diagnosis and identification of sexual abuse. In her experience as a counselor she may have gained such expertise. However, the record before this Court discloses *none* of this information. Absent evidence of education, training, experience, or specialized knowledge in the area of investigating or diagnosing sexual abuse, Hart should not have been deemed an expert on that subject.

■ The foundation presented for McKay's testimony suffers from similar deficiencies. McKay testified that she had a master's degree in an unspecified field. In chronicling her employment history, McKay noted that she had worked as a counselor for four years at the Gooding School for the Deaf, where seventy to eighty percent of the children with whom she worked had "issues regarding sexual abuse." McKay was licensed as a counselor and in 1998 began

working at SANE, where she split her time between victims of sexual abuse and teen-aged offenders. She testified that she participated in workshops, training, classes, and read literature in her field. McKay had conducted approximately sixteen to eighteen counseling sessions with A.B. Nothing in McKay's testimony suggests that she was an expert at determining whether a child's allegations of sexual abuse were true. As with counselor Hart, the focus of her testimony was on her *counseling* background, experience, and training.

We do not intend to deprecate the skills or professionalism of Hart or McKay. Both appear to be well qualified for the service they provide as counselors. However, the art or science of divining whether a child who has made allegations of sexual touching has in fact been abused calls for additional expertise that was not shown to be possessed by these witnesses. Consequently, we conclude that, on the foundation presented, the district court erred in finding these counselors qualified to testify as to their diagnoses of sexual abuse.

### 2. Methodological basis for counselors' opinions

In addition to challenging the qualifications of the counselors as diagnostic experts, Konechny contends that the foundation for their testimony was deficient for lack of any evidence of the scientific reasoning or methodology that brought the counselors to their opinions.

■ Once qualified as an expert, a witness may testify in the form of an opinion if the expert's specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue. I.R.E. 702.

The information, theory or methodology upon which the expert's opinion is based need not be commonly agreed upon by experts in the field, but it must have sufficient indicia of reliability to meet I.R.E. 702 requirements. *Merwin*, 131 Idaho at 646, 962 P.2d at 1030. "[T]he key to admission of [an expert's] opinion is the validity of the expert's reasoning and methodology.... The court's function is to distinguish scientifically sound reasoning from that of the self-validating expert, who uses scientific terminology to present unsubstantiated personal beliefs." *Ryan v. Beisner*, 123 Idaho 42, 46, 844 P.2d 24, 28 (Ct. App.1992) (quoting *Landrigan v. Celotex Corp.*, 127 N.J. 404, 605 A.2d 1079, 1084 (1992)).

■ The Idaho Supreme Court has not defined a particular line of inquiry to determine whether sufficient indicia of reliability have been shown for admission of an expert's testimony, but instead has applied I.R.E. 702 on a case-by-case basis. *State v. Faught*, 127 Idaho 873, 876, 908 P.2d 566, 569 (1995); *State v. Gleason*, 123 Idaho 62, 65, 844 P.2d 691, 694 (1992); *State v. Crea*, 119 Idaho 352, 355–56, 806 P.2d 445, 448–49 (1991). Most recently, in *Merwin, supra*, our Supreme Court addressed a challenge from a defendant who claimed that the admission of expert testimony on pediatric head trauma was improper because the studies relied upon by the experts did not meet the standards of the United States Supreme Court decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[3] While the Idaho Supreme Court did not expressly adopt the *Daubert* approach, it followed a similar analytical method and tested the expert testimony based upon factors which

---

**3.** The *Daubert* decision established the standard for federal courts to utilize in determining whether to admit expert testimony under Federal Rule of Evidence 702, a rule which mirrors I.R.E. 702. The United States Supreme Court outlined a number of factors that a court could consider in evaluating the reasoning and methodology that underlie an expert opinion. The Court stated that indicia of reliability include whether the theory or technique in question can be tested, whether it has been subjected to peer review and publication, its known or potential error rate, the existence and maintenance of standards governing its use, and whether it has attracted widespread acceptance within a relevant scientific community. *Daubert*, 509 U.S. at 592–95, 113 S.Ct. at 2796–97, 125 L.Ed.2d at 482–83. The U.S. Supreme Court has recently extended *Daubert*'s general principles, that the specialized testimony must be reliable and relevant, to areas of not just scientific knowledge, but also technical and "other specialized" knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49, 119 S.Ct. 1167, 1174–75, 143 L.Ed.2d 238, 249–51 (1999).

tended to show the reliability of the studies that underlay the expert opinion. As a threshold matter, the Court noted that conclusions from scientific studies need not be universally accepted in order to be relied upon by experts. *Merwin*, 131 Idaho at 646, 962 P.2d at 1030. The Court then concluded that the experts had provided sufficient foundation to show that the studies upon which their opinions were based were reliable. The indicia of reliability identified by the Idaho Supreme Court included the close oversight and observation of the test subjects, the prospectivity and goal of the studies, and the subjection of the results to peer review. *Id.*

█ This Court has also utilized a *Daubert*-like approach in addressing a challenge to the expert testimony. In *State v. Parkinson*, 128 Idaho 29, 909 P.2d 647 (Ct.App. 1996), we considered the defendant's offer of expert testimony that he did not fit the psychological profile of a sexual offender. Along with the criteria considered in *Daubert*, we suggested a number of additional factors that a trial court might consider when analyzing proposed scientific evidence, including:

(1) the presence of safeguards in the technique; (2) analogy to other scientific techniques whose results are admissible; (3) the nature and breadth of inferences drawn; (4) the extent to which the basic data are verifiable by the court and jury;

(5) availability of other experts to test and evaluate the technique; (6) the probative significance of the evidence in the circumstances of the case.

*Id.* at 34, 909 P.2d at 652. In determining the reliability of the profile utilized by the defense expert, this Court looked for foundational information about the individual characteristics and components that made up the profile, some description of the methodology by which the profile was derived, how the profiling technique had been tested, some information about the accuracy of the profile in distinguishing between offenders and nonoffenders, and evidence of the degree of acceptance of the profiling and assessment technique in the relevant professional community. *Id.* at 34–35, 909 P.2d at 652–53. Finding an absence of such foundational evidence, this Court affirmed the exclusion of the defense expert's testimony. *Id.* at 35, 909 P.2d at 653.

█ In the context of a mental health professional's testimony that sexual abuse has occurred, the indicia of reliability standard requires a showing that the opinion was derived through application of some reliable methodology; that is, a methodology that is reasonably accurate in distinguishing between children who have been sexually abused and those who have not.[4] It also

4. There is substantial controversy as to whether such a methodology exists. Some scientific research suggests that the current state of the art of psychology and psychiatry does not enable mental health professionals to reliably distinguish between victims of sexual abuse and nonvictims. In *Jeopardy in the Courtroom, a Scientific Analysis of Children's Testimony* (1995), published by the American Psychological Association, authors Stephen J. Ceci and Maggie Bruck survey numerous studies that have been conducted in this field and conclude:

[T]here are no diagnostic behavioral indicators of sexual abuse that occur in all or even most abused children but that are simultaneously absent in all nonabused children. Although many experts have claimed that nonsexual symptoms such as sleep disturbances, night tremors, regressive toileting (e.g., urinary accidents, bed wetting), sudden personality shifts, anxiety, and reluctance to go to school are consistent with sexual abuse, these very same nonsexual symptoms are commonly found among many nonabused preschool-age children.

... [S]ome experts have claimed that although these nonsexual childhood problems may not be diagnostic indicators, sexualized behaviors surely are reliable indicators of sexual abuse. But again, the experts who have made these claims appear to have failed to consider the complete literature on children's sexual knowledge and children's sexual play. Some studies have indicated that young sexually abused and nonabused children do not differ in their levels of sexual knowledge.

. . . .

[I]t appears that trained adults cannot reliably detect false reports from children who are exposed to repeated suggestive techniques over long periods of time. This is because the effect of such prolonged suggestion may alter some of the children's memory; if they have a false belief, they are not consciously lying, and therefore no form of lie detection ought to identify this.

. . . .

One might argue that the content and quality of the children's narrations in laboratory-based studies is quite different from the narratives of children reporting sexual abuse, thus enabling

requires that the expert bring to bear a level of skill or a scientific or technical approach that is beyond the scope of the average juror. In *Allen*, we held that a child psychiatrist's opinion that a six-year-old child had actually experienced the sexual abuse which she reported did not meet this standard:

> In this case ... Ashby [the psychiatrist] did not attempt to diagnose whether SDC was a victim of sexual abuse by performing any diagnostic tests or interview techniques which were beyond the common experience of average jurors; such as comparing whether SDC's behavior patterns were consistent with the behavior patterns of other sexually abused children. Rather, Ashby simply conducted an hour-long personal interview with SDC and her mother, during which he evaluated SDC's credibility (not her symptoms of sexual abuse) by observing such factors as the logical consistency of her story, her body language as she related her story, the congruence between the feelings SDC presented and what she was saying, whether her story seemed "canned" or spontaneous, and whether SDC or her mother appeared to have any ulterior motives for bringing such allegations against Allen. These are the same criteria by which jurors commonly determine the credibility of witnesses.

> . . . .

> Ashby's testimony was also inadmissible because it went beyond the permissible bounds of expert opinion to assess the credibility of SDC, the complaining witness. "[A]n expert's opinion ... is admissible up to the point where an expression of opinion would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence. To venture

beyond that point, however, is to usurp the jury's function."

*Allen*, 123 Idaho at 884, 853 P.2d at 629.

Similarly, in *Johnson*, this Court held that where a physician found no physical evidence of sexual abuse and rendered an opinion that children had been sexually abused based solely upon the histories provided by the children and their mother during a single visit with the doctor, the doctor's opinion was essentially a judgment on the children's credibility and was therefore inadmissible. *Johnson*, 119 Idaho at 857, 810 P.2d at 1143. A like result was reached in *Pugsley*, where we held that a pediatrician's testimony that a child had been molested should not have been admitted where the physical examination was neutral and the doctor's opinion was based upon his assessment of the logical consistencies and details of the child's story. *Pugsley*, 128 Idaho at 176, 911 P.2d at 769.

█ In the present case, the foundational testimony described no methodology or diagnostic tools employed by Hart or McKay to reach their opinions that Konechny's stepdaughters were sexually abused. According to counselor Hart, her opinion that C.D. had been sexually abused was based upon "reading the CARES interview and C.D.'s disclosure there and my time with C.D. in our sessions and being able to talk with primarily the father who is the one that has transported her to the session, so what he's observing, and periodically phone calls with the mother." Counselor McKay said that her opinion was based upon "my experience, my training and the consistency of the child." Neither counselor described a manner of arriving at her diagnosis that could fairly be characterized as a scientific "methodology." There was no description of diagnostic tools that had been demonstrated to be accurate means

---

well-trained professionals to reliably differentiate between true and false reports of sexual abuse even if they cannot do so for other types of events. Unfortunately, the existing literature suggests that this is not the case. There is little consistency among professionals' judgments about children making claims of sexual abuse.

. . . .

[Studies] suggest that at least for some allegations of child sexual abuse, there is no "Pinocchio Test" that can be used even by the

most experienced and qualified experts to definitively ascertain whether or not abuse occurred. Yet despite this limitation, experts continue to go into court and give their opinions with great confidence solely on the basis of the signs and characteristics of sexual abuse and on the basis of the markers of credibility in children. Wise counselors and judges should put these experts' feet to the coals, forcing them to provide scientifically adequate evidence for their interpretations.

(Citations to studies omitted.)

of determining whether sexual abuse occurred. As in *Allen*, these counselors did not claim to have used "any diagnostic tests or interview techniques which were beyond the common experience of average jurors ." *Allen*, 123 Idaho at 884, 853 P.2d at 629. Indeed, the foundation offered for these witnesses' testimony was even less than that which was found to be inadequate in *Allen*.

This Court appreciates and shares society's high level of concern about sex crimes against children. However, as the Supreme Court of Utah has expressed,

> [T]he fact that child sexual abuse has emerged as a critical problem about which the public is seriously concerned does not mean all legal rules that may constitute obstacles to increasing the conviction and incarceration rates of those accused of such crimes, as opposed to those actually guilty, can properly be brushed aside.

*Rimmasch*, 775 P.2d at 390. Our abhorrence of the offense does not justify a diminishment of judicial vigilance against the use of untrustworthy evidence. On the foundation provided here, the opinions of Hart and McKay did not meet applicable reliability standards and therefore were not admissible.

 This Court must now determine whether the error in admitting this opinion testimony was harmless. Any error or irregularity in the admission of evidence which does not affect the defendant's substantial rights must be disregarded. Idaho Criminal Rule 52. To determine whether the error affected the defendant's substantial rights or was harmless, an appellate court asks whether it appears, beyond a reasonable doubt, that there was no reasonable possibility that the error contributed to the conviction. *See State v. Cross*, 132 Idaho 667, 670, 978 P.2d 227, 230 (1999); *State v. Roy*, 127 Idaho 228, 231, 899 P.2d 441, 444 (1995); *Johnson*, 119 Idaho at 859, 810 P.2d at 1145.

 After reviewing the record, we are unable to conclude beyond a reasonable doubt that the jury would have found Konechny guilty had the opinions of the counselors been excluded. Konechny testified and denied the children's accusations. It was the defense theory that the girls' natural father, his wife, or the girls' stepsister may have intentionally or unintentionally influenced the children to raise their allegations against Konechny by implanting the idea of sexual abuse in the minds of the impressionable young girls. Hence, the case turned upon the credibility of the victims. The jury may have been swayed toward its finding of guilt by the counselors' testimony, which bolstered the victims' credibility. Consequently, we must reverse the judgment of conviction and remand the case for a new trial. *See Johnson*, 119 Idaho at 859, 810 P.2d at 1145.

## B. Additional Issues on Appeal

Konechny raises a number of additional issues in this appeal. To the extent necessary to provide guidance on remand, we will address them.

### 1. Limitations placed on defense experts' testimony

 Prior to trial, defense counsel gave notice that he intended to call two mental health professionals to testify as expert witnesses. The State filed a motion in limine in an effort to exclude or limit their testimony. In his offer of proof, defense counsel said that he intended to elicit testimony from these two witnesses covering a number of broad areas including the suggestibility of children, children's memories, and the general validity of allegations of child abuse. Konechny's attorney did not detail the foundation for or content of any of this proposed testimony. The district court did not preclude the witnesses from testifying altogether, but did prohibit them from testifying about several specific subjects. Given the vague and very limited offer of proof presented by defense counsel, we cannot say that the proffered testimony was clearly admissible. Therefore, we do not find that the district court abused its discretion in limiting the testimony of Konechny's witnesses. *Merwin*, 131 Idaho at 645–46, 962 P.2d at 1029–30. This ruling does not, however, preclude Konechny from reoffering testimony of his expert witnesses with a more adequate foundation if the case is tried again on remand.

## 2. Exclusion of the felony convictions of the victims' natural father

Konechny next complains of the exclusion of evidence that the victims' natural father had been convicted of felony possession of a controlled substance in 1994 and in 1996. Konechny contends that this evidence was admissible under I.R.E. 609 to impeach the father's testimony.

Rule 609 authorizes the introduction of evidence that a witness has been convicted of a felony for the purpose of attacking the credibility of that witness if the trial court determines that "the fact of the prior conviction or the nature of the prior conviction, or both, are relevant to the credibility of the witness and that the probative value of admitting this evidence outweighs its prejudicial effect to the party offering the witness." The determination of whether a particular felony conviction is relevant to credibility depends on the particular facts and circumstances of each case. *State v. Bush*, 131 Idaho 22, 31, 951 P.2d 1249, 1258 (1997). An appellate court will review the trial court's determination of relevancy of a prior conviction under a de novo standard. *State v. Muraco*, 132 Idaho 130, 968 P.2d 225 (1998); *Bush, supra*. However, a trial court's determination whether the probative value of the evidence outweighs its prejudicial effect is reviewed under an abuse of discretion standard. *Id.*

In *State v. Ybarra*, 102 Idaho 573, 634 P.2d 435 (1981), the Idaho Supreme Court delineated three categories of felonies to determine whether a prior conviction may be used to impeach credibility: "Some, such as perjury, are intimately connected with that issue; others, such as robbery and burglary, are somewhat less relevant; and [a]cts of violence ... generally have little or no direct bearing on honesty and veracity." *Id.* at 580–81, 634 P.2d at 442–43 (internal quotation marks omitted). With regard to category two crimes, the *Ybarra* court noted:

> [R]obbery, larceny, and burglary, while not showing a propensity to falsify, do disclose a disregard for the rights of others which might reasonably be expected to express itself in giving false testimony whenever it would be to the advantage of

the witness. If the witness had no compunction against stealing another's property or taking it away from him by physical threat or force, it is hard to see why he would hesitate to obtain an advantage for himself or friend in a trial by giving false testimony. Furthermore, such criminal acts, although evidenced by a single conviction, may represent such a marked break from sanctioned conduct that it affords a reasonable basis of future prediction upon credibility....

*Id.* (quotation omitted).

The felony drug convictions at issue in this case fall within category two crimes, as they are neither "intimately connected" with credibility, nor crimes of violence with no direct bearing on honesty. The Idaho Supreme Court has held that "arranging a drug transaction in and of itself is not probative of whether a person is truthful or untruthful," *State v. Fernandez*, 124 Idaho 381, 383, 859 P.2d 1389, 1391 (1993), and this Court has stated that "a trial court should be cautious in considering whether a felony conviction for participating in the delivery of a controlled substance is sufficiently relevant, when exploring its admissibility with respect to an issue of credibility under Rule 609(a)." *State v. Franco*, 128 Idaho 815, 818, 919 P.2d 344, 347 (Ct.App.1996). In view of these authorities, we find no abuse of discretion in the trial court's exclusion of evidence that the victims' father had been convicted of possession of controlled substances.

## 3. Exclusion of evidence that the victims' stepsister had been sexually abused

Konechny also complains of the exclusion of evidence that the victims' older stepsister had been sexually abused and had made an appearance before a grand jury in the resulting criminal prosecution just three months before the victims in this case disclosed to the stepsister that Konechny was abusing them. Konechny argued that this evidence was relevant because hearing of the stepsister's abuse may have influenced or prompted the victims in this case to allege abuse by Konechny. The district court, however, dis-

allowed evidence of the stepsister's sexual abuse, holding that it was irrelevant.

■ The relevancy of evidence is reviewed de novo by an appellate court. *State v. Lamphere*, 130 Idaho 630, 632, 945 P.2d 1, 3 (1997); *State v. MacDonald*, 131 Idaho 367, 956 P.2d 1314 (Ct.App.1998). On the theory of relevance advanced by Konechny, evidence of the stepsister's molestation could be relevant only if C .D. and A.B. learned of their stepsister's abuse *before* they reported that Konechny had abused them. Except for A.B., who was five years old at the time of the disclosure, all of the witnesses who addressed the issue, including C.D. and the stepsister, testified that the victims were not told of the stepsister's molestation until after they disclosed Konechny's alleged abuse. A.B. testified confusingly, that "before" she told her stepsister about Konechny's inappropriate touching, A.B.'s stepmother told A.B. "the same thing" had happened to the stepsister. The district court found that this internally inconsistent relation of events by A.B. was not accurate and hence that the evidence of the stepsister's prior victimization was not relevant. On Konechny's theory of relevance, this ruling was not erroneous. Absent some creditable evidence of prior knowledge by A.B. and C.D., the information concerning the stepsister's abuse would not make it more likely that this information influenced A.B. and C.D. to make their allegations.[5]

## C. Ineffective Assistance of Counsel

Konechny has also argued on appeal that his trial counsel provided ineffective assistance by failing to object to testimony that

Konechny had slapped C.D. on multiple occasions. Because we are remanding this case for a new trial, we need not address this claim of ineffective assistance in the first trial proceedings.

## III.

## CONCLUSION

The district court erred in admitting the opinion testimony of counselors Hart and McKay because the State presented insufficient foundational evidence to show that the counselors were qualified to render such opinions or to show that the opinions were reliable. This error is not harmless but requires that Konechny be afforded a new trial. Konechny has not shown error in the trial court's limiting the subject matter about which defense experts could testify, but this determination does not preclude him from offering expert testimony on retrial. Konechny's other claims of error in the exclusion of evidence are without merit, and we decline to address his claim of ineffective assistance of counsel. Konechny's judgment of conviction is vacated, and this case is remanded to the trial court for further proceedings.

Judge SCHWARTZMAN and Judge Pro Tem McDERMOTT concur.

5. We imply no opinion as to whether the evidence might be relevant for other purposes, such as to show that conversations about the stepsister's abuse after A.B. and C.D. made their allegations psychologically reinforced or validated their allegations against Konechny.