IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 49992

| STATE OF IDAHO, | ) | |
| | ) | Filed: November 21, 2025 |
| Plaintiff-Respondent, | ) | |
| | ) | Melanie Gagnepain, Clerk |
| v. | ) | |
| | ) | THIS IS AN UNPUBLISHED |
| VICTOR ARDELL CLAUS, | ) | OPINION AND SHALL NOT |
| | ) | BE CITED AS AUTHORITY |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County. Hon. Scott Wayman, District Judge.

Judgment of conviction for first degree murder, affirmed.

Erik R. Lehtinen, State Appellate Public Defender; Jason C. Pintler, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Raúl R. Labrador, Attorney General; Mark W. Olson, Deputy Attorney General, Boise, for respondent.

_____

TRIBE, Judge

Victor Ardell Claus appeals from his judgment of conviction for first degree murder. Claus argues the district court erred by allowing the State to introduce character and expert testimony in violation of Idaho Rule of Evidence 404(a). We affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

According to evidence adduced at trial, in March 2021, M.S. began a romantic relationship with Claus, who lived in Idaho and was separated but was not yet divorced from his now ex-wife.[1] By early 2021, M.S. was dividing her time between California and Idaho, with plans to relocate to Idaho permanently. On April 13, Claus picked M.S. up from the airport. Security

_____

[1] During the pendency of the case, Claus's wife filed for and obtained a divorce from Claus.

footage from a gas station showed Claus and M.S. appearing happy and affectionate. A short time afterward, however, while M.S. was driving Claus's vehicle with Claus in the passenger seat, M.S. suffered a fatal gunshot wound to the head. The vehicle crossed the median into oncoming traffic, collided with an SUV, clipped a motorcycle, and rolled before coming to rest on the shoulder.

Claus consistently told first responders and law enforcement that M.S. shot herself during an argument about his delayed divorce. Multiple bystanders also heard Claus state that M.S. shot herself. One of the witnesses recovered a gun from the passenger side of the vehicle and later gave it to the officers who arrived on the scene. Notably, at trial, family members and other witnesses testified that, at that time, M.S. was optimistic about her future, and none indicated that she showed any signs of being suicidal.

Sometime later, Claus was transported to the hospital. There, he was interviewed by Detective Sergeant Lallatin of the Kootenai County Sheriff's Office. Detective Lallatin noted signs of Claus's intoxication--a strong odor of alcohol, glassy eyes, and impaired speech; Claus also acknowledged he had been drinking. Claus told Detective Lallatin that M.S. was driving the vehicle when she reached for his gun off the dashboard and committed suicide. A few days later, Detective Lallatin interviewed Claus at the sheriff's office. This time, Claus stated the gun was most likely in the center console underneath some items but that he did not remember with certainty where the gun was on the day of the incident.

Ultimately, the State charged Claus with first degree murder, and the case proceeded to trial. The trial spanned over eight days and involved over forty witnesses.

Claus's ex-wife testified at trial. She testified that Claus habitually kept one of his guns in a holster in the center console of his vehicle. Claus's ex-wife also testified that accessing the gun required someone to press a latch and lift the console up and then remove the gun from the holster. She testified that, in her experience, Claus did not keep his gun on the dashboard. Claus's ex-wife also testified that, during their marriage, Claus had a "short fuse"; had mood swings; and would go from happy to angry quickly, which was exacerbated with alcohol. The State argued that these episodes showed Claus was capable of affectionate behavior quickly followed by violence.

2

Pertinent to the issues raised on appeal, the following witnesses testified for the State. Detective Jerry Northrup testified that, at the scene of the accident, he observed neither "high velocity" blood spatter nor brain matter on M.S.'s hands--findings he would have expected had M.S. shot herself. He further noted the absence of soot, stippling, or powder burns at the entry wound--indicators typically present in a close-range or near-contact gunshot. The medical examiner, Dr. Jennifer Nara, testified that, during the autopsy, examination of the entrance wound indicated that M.S. was shot from an indeterminate or distant range, indicating that M.S. died of homicide. Over Claus's objection, a bloodstain pattern analyst, Randolph Beasley, testified that stains in the vehicle and on clothing showed M.S. had been struck in the face before she was shot. Doctor Ryan Rambaran, a trauma surgeon, testified that he had treated between 750 to 800 gunshot wounds during his residency training. Doctor Rambaran further testified regarding the effect of ammunition type on the appearance of bullet injuries. He described testing that he conducted by firing the same ammunition used in the shooting of M.S. into pig's heads at varying distances. The results showed burns, thermal injuries, and sooting at contact range and at three inches but none at eighteen inches. Based on these findings, Dr. Rambaran concluded that M.S.'s wound was not consistent with a close-range, self-inflicted gunshot wound.

Pertinent to the issues raised on appeal, the following witnesses testified for Claus. Kenn Meneely, a private forensic consultant, testified that bloodstain patterns can be affected by movements during car accidents or the handling of bodies. He also testified that human hair may filter or conceal stippling or sooting from contact gunshot wounds. Meneely testified that his own testing with tanned pigskins at varying distances supported those observations. Doctor Barbara Wolf, a forensic pathologist, testified that the injuries on M.S.'s face were consistent with those sustained in a motor vehicle collision and that, in her opinion, the entrance wound was a hard contact wound. Finally, Dr. David Fowler, also a forensic pathologist, testified that the notion of skin being seared in a contact gunshot wound is a "myth" and that his observations indicated M.S.'s entrance wound was a contact wound.

After trial, the jury found Claus guilty of first degree murder, Idaho Code §§ 18-4001, 18-4003(a). Claus timely appeals.

3

## II.

## STANDARD OF REVIEW

When a trial court's discretionary decision is reviewed on appeal, including evidentiary issues, the appellate court conducts a multi-tiered inquiry to determine whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion; (3) acted consistently with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason. *State v. Herrera*, 164 Idaho 261, 270, 429 P.3d 149, 158 (2018).

## III.

## ANALYSIS

Claus argues the district court abused its discretion when deciding several evidentiary issues. First, Claus argues the district court erred by allowing the State to introduce character evidence regarding his mood and irritability. Second, Claus argues the district court erroneously allowed an expert witness to give testimony based on speculation. Third, Claus argues the district court abused its discretion by allowing an unqualified expert to testify about ballistics. Finally, Claus argues that the cumulative error doctrine applies here, necessitating a reversal of his conviction.

### A.     Admission of Character Evidence

First, Claus argues the district court erred in deciding that testimony about his short temper and mood swings were exceptions to I.R.E. 404(a) as indicative of his motive. Claus contends the district court conflated I.R.E. 404(a) with I.R.E. 404(b). Claus also contends the district court erred by relying on I.R.E. 404(b) to admit testimony of his character, which, he argues, could only be admitted under I.R.E. 404(a). The State responds that, "while the challenged testimony referenced and invited inferences about Claus's character, this does not defeat a finding that the testimony ultimately recounted and described *acts*." Therefore, according to the State, the district court correctly assessed the exception to the testimony under I.R.E. 404(b)(2). The State further contends that, if the district court erred, the error was harmless.

The State filed a notice of intent to introduce I.R.E. 404(b) evidence, providing that it intended to introduce testimony of Claus's ex-wife indicating that Claus has a "short fuse" and would have mood swings, especially when under the influence of alcohol. Claus objected, arguing

that the State presented direct references to his character that were precluded from admissibility by I.R.E. 404(a). The district court determined that this testimony described specific instances of behavior but was admissible under I.R.E. 404(b)(2) to prove motive. As a result, the following exchange took place between the State and Claus's ex-wife:

Q: In terms of his moods, did Mr. Claus have a short fuse or not?
A: Yes.
Q: What do you mean yes?
A: Um, he could be in a really great mood and things would be going well and with . . . any little thing could set him off and he would get angry.
Q: How fast could this change from being in a good mood to a bad mood happen?
A: Fairly rapidly.
Q: Can you tell us based on your being around him for this period of time whether or not drinking alcohol magnified that change?
A: Absolutely.
Q: What do you mean by that?
A: Um, when he drank, um, it was particularly bad. Um, and the more he drank, the worse it was. Um, when he was sober, it was not--not nearly as bad, you know. Um, but as soon as he'd have a few beers, he--he--his whole temperament changed. He--any little comment might set him off.

Assuming without deciding the district court abused its discretion by admitting testimony about Claus's mood swings and bad temper--because it is impermissible I.R.E. 404(a) evidence of a character or trait offered to prove Claus acted in conformity with that character or trait on the day M.S. died--we conclude the error is harmless.

Error is not reversible unless it is prejudicial. *State v. Stell*, 162 Idaho 827, 830, 405 P.3d 612, 615 (Ct. App. 2017). Where a criminal defendant shows an error based on a contemporaneously objected-to, nonconstitutional violation, the State then has the burden of demonstrating to the appellate court beyond a reasonable doubt the error did not contribute to the jury's verdict. *State v. Montgomery*, 163 Idaho 40, 46, 408 P.3d 38, 44 (2017). Thus, we examine whether the alleged error complained of in the present case was harmless. *See id.* Harmless error is error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record. *State v. Garcia*, 166 Idaho 661, 674, 462 P.3d 1125, 1138 (2020). This standard requires weighing the probative force of the record as a whole while excluding the erroneous evidence and at the same time comparing it against the probative force of the error. *Id.* If the error's effect is minimal compared to the probative force of the record establishing guilt

beyond a reasonable doubt without the error, then the error did not contribute to the verdict rendered and is harmless. *Id.* The reviewing court must take into account what effect the error had, or reasonably may have had, on the jury in the context of the total setting and in relation to all else that happened, which necessarily includes the evidence presented. *Kotteakos v. United States*, 328 U.S. 750, 764 (1946).

The testimony regarding Claus's mood and temper was exceedingly brief--comprising of only five sentences in a transcript exceeding 2300 pages or five direct-examination questions in an eight-day trial involving more than forty witnesses. Moreover, the record contains substantial independent evidence suggesting that Claus had a "short fuse" and experienced mood swings that were aggravated by alcohol consumption. Text messages exchanged between Claus and M.S. reflect this pattern--shifting abruptly from affectionate declarations to demands that M.S. stay away from him or not leave California. Text messages recovered from M.S.'s phone show communications between her and Claus on April 12 and 13, 2021. On the afternoon of April 12, Claus texted M.S. that he looked forward to seeing her, and M.S. later texted that she loved him. Later that night, after multiple calls and messages, Claus wrote, "You deserve better than me!!! Leave me alone!!!" and "By for ever [sic]." Following further contentious exchanges on the evening of April 12, Claus texted M.S. on the morning of April 13 that he loved her but shortly thereafter wrote, "Stay down there!!! Finish all your things!!! Call me when you get back!!! Until then leave me alone!!" He later added that he was too drunk to drive to the airport, repeating, "Stay down there!! Leave me alone!!" Later that day, Claus picked M.S. up from the airport. Surveillance footage from the gas station similarly depicts Claus as initially affectionate toward M.S. before a sudden argument ensued, culminating in her erratic driving and subsequent death. In his recorded interrogation with Officer Lelland, which was admitted without objection, Claus acknowledged having an argument with M.S.

In addition, Claus's temper was not a central component of the State's case. The prosecution did not emphasize Claus's temper or mood swings in its opening argument, and his ex-wife was not a key witness for the State. In fact, the first time the jury heard testimony of Claus's ex-wife was on the third day of trial, after the expert testimony and testimony of the officers. The State primarily relied on the expertise of law enforcement and expert witnesses to rebut Claus's theory that M.S. committed suicide. As set forth below, Claus's arguments regarding

6

the lack of foundation for the State's experts' testimonies are without merit. This includes the testimony from Beasley, the State's expert witness, that M.S. suffered head wounds before the shot. While the trial may have been a battle of the experts, the jury rejected the opinion of the defense's experts that the gunshot was a contact wound (seemingly necessary for a self-inflicted wound) as opposed to the State's experts' opinion that the gunshot was from some distance. Given the brief nature of the challenged testimony, and in light of the overwhelming independent evidence, we conclude that the admission of the character evidence was harmless.

## B.     Testimony of Randolph Beasley

Next, Claus argues the district court abused its discretion by admitting testimony from Randolph Beasley. Claus contends that Beasley's testimony should have been excluded because his observations about the blood spatter were improperly based on a false belief that one of the witnesses observed Claus striking M.S. in the face before she died. Claus asserts that there was no independent evidence supporting that the battery may have taken place. As a result, Claus contends that Beasley's testimony, in its entirety, was speculative and of no assistance to the jury.

The district court found that Beasley made two references to the witness's testimony about an altercation between Claus and M.S. The district court noted that Beasley's opinion is largely supported by the facts in the record and not witness testimony alone. The district court determined that Beasley cited to multiple bases for his conclusion that Claus hit M.S., including the pattern of the blood spatter, the autopsy results, and the testimony of the other expert witness. The district court found that inconsistencies in Beasley's report, if any, go to the weight of the evidence not the admissibility of the entire report. Ultimately, the district court held that Beasley's report was not based on speculative witness testimony and was supported by the evidence in the record.

A trial court's determination on the admissibility of expert testimony is reviewed for an abuse of discretion. *Herrera*, 164 Idaho at 272, 429 P.3d at 160. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. I.R.E. 702. An expert's opinion that is speculative or unsubstantiated by facts in the record is inadmissible because it would not assist the trier of fact. *State v. Caliz-Bautista*, 162 Idaho 833, 836, 405 P.3d 618, 621 (Ct. App.

7

2017). Testimony is speculative when it theorizes about a matter as to which evidence is not sufficient for certain knowledge. *Adams v. State*, 158 Idaho 530, 538, 348 P.3d 145, 153 (2015).

Claus relies on *State v. Samuel*, 165 Idaho 746, 452 P.3d 768 (2019), to support his argument. However, the facts in *Samuel* differ from the facts in the instant matter. In *Samuel*, an expert witness testified about the possible level of intoxication of Samuel. *See id.* at 776, 452 P.3d at 798. The expert acknowledged he could not state with certainty that Samuel had a certain drug in his bloodstream at the time of the incident since he did not have his blood drawn. *Id.* Instead, the expert relied on a hair sample taken three weeks after the charged conduct that did not show the quantity of drug use but chronic use. *Id.* Therefore, while the hair sample reflected chronic use, the drug might not have been administered the particular day at issue. *Id.* Similarly, when questioned about his report noting six missing pills from Samuel's father's prescription, the expert conceded that, although they were "presumably" administered to Samuel, absent a blood sample the expert could not confirm this. *Id.* The district court excluded any opinions of the expert witness that were based upon intoxication from the drug because the expert did not know if the drug was in Samuel's system at the time of the charged conduct. *Id.* at 777, 452 P.3d at 799.

Unlike in *Samuel*, Beasley did not base his opinions and conclusions about an altercation taking place between Claus and M.S. on nonexistent evidence. In his report, Beasley indicates that the observed impact bloodstain pattern[2] on the left side of the steering wheel and drip bloodstain patterns[3] on the driver's seat were consistent with blunt force trauma and *may have been* part of an altercation described by some witnesses. In fact, Beasley's report references several other bloodstain patterns on the side of M.S.'s face, her jeans, and the steering wheel that are consistent with blunt force trauma but omits any mention of a domestic dispute. At trial, Beasley testified that the location and the type of bloodstain patterns mentioned above indicate that M.S. must have been positioned directly above her thighs in a more upright posture, consistent with her sitting in the driver's seat before her death or the deployment of an airbag. Finally,

---

[2]     As stated in Beasley's report, an "impact pattern" is defined as a bloodstain pattern resulting from an object striking liquid blood.

[3]     As stated in Beasley's report, a "drip stain" is a bloodstain resulting from a falling drop that formed due to gravity.

Beasley's conclusion that Claus struck M.S. in the face at least twice is based on: (1) Beasley's reconstruction of the approximate position of M.S.'s head at the time of the shooting, (2) the trajectory of the wound path determined during the autopsy, (3) the absence of "backspatter" on M.S.'s right hand, and (4) the opinion of Dr. Nara related to the examination of the entry wound. Beasley's opinion was based on the blood spatter in the vehicle as indicated in his report and testimony. Because it correctly determined that Beasley's report was not based on speculative witness testimony, the district court did not abuse its discretion in admitting Beasley's testimony.

## C. Unqualified Expert Witness

Next, Claus argues the district court erred by allowing the State's expert witness, Dr. Ryan Rambaran, to testify as a ballistics expert. Specifically, Claus challenges Dr. Rambaran's testimony regarding the effect a certain type of bullet would have on the shape and thermal characteristics of a gunshot wound.

Although Claus cites to the record, he does not present any legal support or citations for his argument. Idaho Appellate Rule 35(a)(6) requires appellants to do more than point to background facts underlying their position; it requires reasons those facts constitute legal error with citations to the authorities, statutes, and parts of the transcript and record relied upon. *Wood v. Idaho Transp. Dep't*, 172 Idaho 300, 307, 532 P.3d 404, 411 (2023). Claus fails to provide any legal authority to support his argument, and when an appellant fails to support his position with sufficient authority, it is too indefinite to be decided by this Court. Consequently, assignments of error that are not argued and supported in compliance with I.A.R. 35(a)(6) are deemed to be waived, and we will not consider them. Even if we were to consider Claus's argument, the argument fails.

After reviewing Dr. Rambaran's report and curriculum vitae during pretrial motions, the district court reserved its decision on whether Dr. Rambaran qualified as an expert. At trial, Claus again objected to Dr. Rambaran's testimony on foundational grounds, challenging his qualifications as a ballistics expert. Specifically, Claus objected to Dr. Rambaran's testimony, arguing that he could be qualified as a trauma surgeon but should not be qualified as an expert in ballistics. The district court overruled the objection.

On appeal, Claus asserts that Dr. Rambaran is not qualified as a ballistics expert because he: (1) had never previously testified as one; (2) was not certified to perform ballistic

testing; (3) was not certified to examine evidence from firearms; (4) had no affiliation with any forensic lab, medical societies, or groups having to do with ballistics; (5) had never reviewed manuals related to ballistics testing or analytical methods; (6) did not have any formal firearms training beyond basic functions, safety, and accuracy; and (7) was not a forensic pathologist.

A trial court's determination on the admissibility of expert testimony is reviewed for an abuse of discretion. *Herrera*, 164 Idaho at 272, 429 P.3d at 160. Idaho Rule of Evidence 702 provides that a qualified expert witness may testify if the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." The five sources of expert qualifications identified in the rule are disjunctive. *State v. Glass*, 146 Idaho 77, 82, 190 P.3d 896, 901 (Ct. App. 2008); *State v. Eytchison*, 136 Idaho 210, 212-13, 30 P.3d 988, 990-91 (Ct. App. 2001). Therefore, contrary to Claus's assertions, academic training is not always a prerequisite to be qualified as an expert; practical experience or specialized knowledge may be sufficient. *See State v. Konechny*, 134 Idaho 410, 414, 3 P.3d 535, 539 (Ct. App. 2000). However, there must be some demonstration that the witness has acquired, through some type of training, education or experience, the necessary expertise and knowledge to render the proffered opinion. *Id.*

At the time of trial, Dr. Rambaran had been an attending trauma surgeon for the past four years and general surgeon for the previous twelve years. Doctor Rambaran has formal training and significant clinical experience "identifying types of gunshot wounds." This training included "the nature of high and low velocity gunshot wounds, their presentation, their effect on wound tissue and the necessary steps of repairing the tissue/organ after injury." His practical experience included being involved in the treatment of "about 800-1000 shootings of all calibers." Doctor Rambaran has also been a consultant in terminal ballistics for Lehigh Defense, where he performs testing of ballistic tissue injuries. In addition to his professional experience, Dr. Rambaran testified about his extensive personal knowledge of firearms that included building his own firearms and reloading his own ammunition.

This testimony established Dr. Rambaran's specialized expertise in gunshot wounds and how particular types of bullets influence the shape and thermal effect of the wound. In the context and circumstances of this case, Dr. Rambaran did not require any specialized certification in

ballistics. The district court did not abuse its discretion in allowing Dr. Rambaran to testify regarding the difference between the impact of different types of bullets on a wound.

As to the experiment Dr. Rambaran conducted, Claus asserts that it should not have been admitted because it had no accepted scientific basis. This is not the legal standard for the admissibility of a scientific experiment in Idaho. The standard for admissibility of a scientific experiment in Idaho is that experiments "based upon reasonably similar circumstances are admissible to show the existence or nonexistence of a fact, and the circumstances do not need to be exactly the same as those surrounding the event." *State v. Cypher*, 92 Idaho 159, 171, 438 P.2d 904, 916 (1968). Similarity of circumstances and conditions must be left to the sound discretion of the trial court and determined by it, subject to review only for an abuse of discretion. *Id.* "If the conditions [of an experiment] are substantially similar, then the differences in conditions go to the weight of the evidence and not to its admissibility." *Lopez v. Allen*, 96 Idaho 866, 871, 538 P.2d 1170, 1175 (1975).

Doctor Rambaran was required only to recreate circumstances reasonably similar to those of the shooting of M.S. He testified that he used a pig's head, given the similarity of pig and human skin at the cellular level, to evaluate the thermal effects of a gunshot wound. He conducted the experiment with the same type of ammunition used in the shooting of M.S., a firearm of a similar model, and human hair to replicate the conditions as closely as possible. Accordingly, the district court did not abuse its discretion in admitting Dr. Rambaran's testimony regarding the experiment.

## D.    Cumulative Error Doctrine

Finally, Claus also contends that the cumulative error doctrine applies here, necessitating a reversal of his conviction. Under the doctrine of cumulative error, a series of errors (harmless in and of themselves) may in the aggregate show the absence of a fair trial. *State v. Adamcik*, 152 Idaho 445, 483, 272 P.3d 417, 455 (2012). However, a necessary predicate to the application of the doctrine is a finding of more than one error. *Id.* Claus has failed to demonstrate at least two errors, a necessary predicate to the application of the cumulative error doctrine.

## IV.

## CONCLUSION

Assuming the district court abused its discretion by admitting testimony about Claus's mood swings and bad temper, any error was harmless. Claus has failed to meet his burden that the district court abused its discretion by admitting: (1) "speculative" expert testimony about M.S.'s wounds; and (2) ballistics opinions and an experiment from a trauma surgeon. Additionally, Claus is not entitled to relief based on cumulative error. Therefore, Claus's judgment of conviction for first degree murder is affirmed.

Chief Judge GRATTON and Judge HUSKEY, **CONCUR**.