# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 41494

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | Boise, June 2015 Term |
| | ) | |
| Plaintiff-Respondent, | ) | 2015 Opinion No. 111 |
| | ) | |
| v. | ) | Filed: November 30, 2015 |
| | ) | |
| JOSEPH D. HERRERA, | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| Defendant-Appellant. | ) | SUBSTITUTE OPINION. THE |
| | ) | COURT'S PRIOR OPINION |
| | ) | DATED AUGUST 7, 2015 IS |
| | ) | HEREBY WITHDRAWN |

Appeal from the District Court of the First Judicial District of the State of Idaho, Benewah County. Hon. Fred M. Gibler, District Judge.

The judgment of conviction is <u>vacated</u> and the case is <u>remanded.</u>

Sara B. Thomas, State Appellate Public Defender, Boise, for appellant. Justin M. Curtis argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

_____

J. JONES, Chief Justice

Joseph Herrera appeals from a conviction of second-degree murder. Herrera was holding a firearm that discharged, killing his girlfriend, Stefanie Comack. Herrera argues (1) there was insufficient evidence to support a finding of malice, and (2) improper testimony from a number of witnesses unfairly prejudiced his case.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

At the time of the shooting, Herrera and Stefanie had been dating for three to four months and were living together in Herrera's parents' house. For some time leading up to the shooting, Herrera was in possession of two of his father's handguns, which he had taken without his father's knowledge. On December 24, 2011, Herrera was out late and arrived home around 4:30 or 5:00 a.m. on Christmas morning, having used both methamphetamine and marijuana that

1

morning. Herrera testified that when he arrived home he went to sleep for a few hours and woke up at roughly 10:00 a.m. When Herrera and Stefanie woke up Christmas morning, they began arguing about Facebook messages Stefanie had exchanged with other men and the fact that Herrera did not want to go to Stefanie's mother's house for Christmas.

Herrera testified the gun that killed Stefanie was in the drawer of a nightstand next to his bed the morning of the shooting. He testified that during the course of their argument, Stefanie was packing her things to go to her mother's house and that he was handling the gun. Herrera claims that Stefanie was packing to go to her mother's house only to celebrate Christmas, but the State's theory was that she was packing to leave Herrera and end the relationship. He testified that he planned to drive Stefanie to her mother's house and was unloading the gun to hide it so his mother would not find it while he was gone. At some point, Herrera removed the magazine from the gun, but there was a round in the chamber. Herrera testified that at the moment he picked the gun up out of the drawer, he did not believe there was a round in the chamber.

He gave varying accounts of what exactly caused the gun to discharge. Herrera told the first officer on scene that when he was trying to unload the gun it just "went off and hit her in the head." In a police interview several hours after the shooting, Herrera told the officers he was in the process of taking the magazine out of the gun, and then he pulled the slide back, and the gun went off. At trial, Herrera testified that he began to lift the gun to point it at himself to make the point to Stefanie that he would rather kill himself than go to her mother's house for Christmas. He said that when he began to do this, Stefanie "grabbed the barrel of the gun and pulled it and it went off." In his factual account provided at trial, Herrera did not testify to ever touching or pulling on the gun's slide. When asked whether he did pull the slide back, Herrera stated that he did not remember. Herrera testified that, although he had never shot this gun before, he did have experience shooting guns, and he had taken a hunter's safety course.

Although Herrera testified he did not remember the gun coming into contact with Stefanie's forehead, testimony from the emergency room physician who first examined Stefanie and from the county medical examiner strongly evidenced that the gun was pressed against Stefanie's forehead when it fired. Additionally, testimony from an Idaho State Police forensic scientist established that the gun was incapable of firing without the trigger being pulled. He also testified that when the magazine was in the gun and there was only one cartridge remaining in the gun, the gun tended to fail to eject the final cartridge from the chamber when the slide was

pulled.

By all accounts, Herrera was extremely upset after the fatal shot was fired. His mother testified that Herrera "was standing, and was waving his arms, and he was screaming and saying, 'Oh, my God. I accidentally shot Stefanie.'" When the first officer arrived, Herrera ran to him, screaming for help because he had accidentally shot his girlfriend. The officer described Herrera as "totally hysterical," that "[h]e was just screaming. Not really coherently very much."

Following a police interview, Herrera was arrested and charged with second-degree murder. Prior to trial, the district court held a hearing to determine the admissibility of certain evidence at trial, consisting primarily of testimony from third parties as to statements allegedly made by Stefanie concerning her relationship with Herrera and past violent events involving Herrera. The court ruled that a number of these statements would be admissible at trial to show Stefanie's state of mind in the days leading up to the shooting. With these statements the State attempted to show that Stefanie was unhappy in the relationship and intended to end it. There were also statements made by witnesses at trial concerning matters the court had specifically excluded following the pre-trial hearing. The jury was instructed on second-degree murder, voluntary manslaughter, and involuntary manslaughter. Herrera was convicted of second-degree murder and sentenced to life in prison with twenty-two years fixed. He timely appealed.

## II.
## ISSUES ON APPEAL

Herrera raises the following issues on appeal:

1.  Whether there is sufficient evidence to support a finding of the malice required for a second-degree murder conviction.

2.  Whether testimony at trial unfairly prejudiced Herrera's case.

## III.
## ANALYSIS

**A.    There was sufficient evidence to support the jury's verdict.**

Herrera argues that, as a matter of law, one who believes a gun is unloaded cannot have the malice required for second degree murder if that gun fires and a death results. He also argues that allowing one to be convicted of murder under the circumstances in this case would render a nullity part of Idaho Code section 18-4006's involuntary manslaughter provision. This issue is a mixed question of law and fact. The legal question is whether a belief that a gun is unloaded prevents any possible finding of the malice required for murder. If the answer to that question is

3

anything but an unqualified "yes," the factual determination must then be made as to whether Herrera's specific conduct shows he acted with malice. The authorities do not support the bright-line distinction between murder and manslaughter that Herrera suggests.

"Murder is the unlawful killing of a human being . . . with malice aforethought." I.C. § 18-4001. Malice can be express or implied. I.C. § 18-4002. It is express where one has the deliberate intention to unlawfully take a life. *Id.* One acts with implied malice where "the circumstances attending the killing show an abandoned and malignant heart." *Id.* Implied malice may include killings where there is no intent to kill, such as a killing during the commission of a felony or a killing evidencing a depraved heart. *State v. Lankford*, 116 Idaho 860, 866−67, 781 P.2d 197, 203−04 (1989). In *State v. Porter*, we stated the elements of implied malice that will support a charge of murder under a depraved heart theory are met when:

1. The killing resulted from an intentional act,
2. The natural consequences of the act are dangerous to human life, and
3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

142 Idaho, 371, 374−75, 128 P.3d 908, 911−12 (2005); *see also* ICJI 702. Ultimately, it is the province of the jury to determine whether the evidence in the record supports only a conviction of manslaughter or whether there is sufficient proof of malice to amount to murder.[1] *State v. Gomez*, 94 Idaho 323, 325, 487 P.2d 686, 688 (1971).

Herrera cites several sources to support his argument that the authorities uniformly hold one cannot have the requisite malice for murder and also believe his or her gun to be unloaded. He quotes American Jurisprudence as follows:

> Where a person points a pistol at another in sport, as a joke, or merely to cause fright, believing and perhaps having some reason to think that it is not loaded, and subsequently pulls the trigger, causing the pistol to be discharged, and resulting in the killing of the person pointed at, he or she is guilty of manslaughter.

40 Am. Jur. 2d Homicide § 90. He also cites several cases from non-controlling jurisdictions to support the same proposition. However, Herrera fails to address language in these sources acknowledging circumstances where such conduct can amount to second-degree murder.

---

[1] Although the court may apply a presumption of malice where the use of a deadly weapon results in unlawful death, *Gomez*, 94 Idaho at 325, 487 P.2d at 688, the district court denied the State's request for an instruction on this presumption. The record does not contain the discussion leading to the court's rejection of the instruction, and we do not address the applicability of the presumption to this case.

American Jurisprudence states that the standard quoted by Herrera is correct only "under circumstances not evidencing a heart devoid of a sense of social duty." *Id.* Additionally, the cases he cites show that courts look at the totality of the circumstances surrounding the killing to decide whether a defendant acted with malice. While the courts do consider whether the shooter believed the firearm to be loaded, that is one of several factors. None of the sources cited by Herrera support the bright-line distinction he suggests. Therefore, even assuming arguendo that Herrera believed the firearm to be unloaded, an examination of his specific conduct is necessary to determine whether there was substantial evidence to support a finding of malice.

Herrera further argues that to allow one to be convicted of murder while believing the firearm to be unloaded would nullify a portion of the involuntary manslaughter provision. In relevant part, that section provides that involuntary manslaughter is the non-malicious "unlawful killing of a human being . . . in the operation of any firearm or deadly weapon in a reckless, careless or negligent manner." I.C. § 18-4006(2). Although involuntary manslaughter includes some killings that result from reckless operation of a firearm, when the degree of recklessness rises to the level of a disregard for human life, the killing rises to the level of murder. LaFave's treatise on criminal law is helpful in a further explanation of this concept, and we have made use of that source a number of times in discussing malice. *See, e.g. Lankford*, 116 Idaho at 866−67, 781 P.2d at 203−204; *State v. Enno*, 119 Idaho 392, 404, 807 P.2d 610, 622 (1991).

LaFave explains the conduct required for depraved heart murder by a comparison to various lesser degrees of risk. 2 Wayne R. LaFave, Substantive Criminal Law § 14.4(a) (2d ed.). Conduct that creates an "unreasonable risk" of injury is "ordinary negligence." *Id.* Conduct that creates a "high degree of risk" is "gross negligence." *Id.* If the person creating that risk realizes the risk, the conduct is "reckless." *Id.* Grossly negligent or ordinary reckless conduct that results in death may serve as a basis for manslaughter but is insufficient for murder. *Id.* For depraved heart murder there must be a "very high degree" of risk, which is something quite substantial, but is "something far less than certainty or substantial certainty." *Id.* (footnote omitted). The difference between these risks is one of degree, and there is no exact boundary between each category. *Id.* However, it is not the degree of risk in the abstract that matters to the determination; in other words, it is not the mathematical probability of harm that shows the degree or risk. *Id.* Instead, it is evaluated by "what the defendant should realize to be the degree of risk, in the light of the surrounding circumstances which he knows." *Id.*

In assessing the category of risk, the social utility of the conduct should also be considered. *Id.* For example, one speeding through crowded streets in a reckless manner in order to rush an injured passenger to the hospital for emergency treatment may create a very high probability that someone will be killed. *Id.* But that high probability should be considered in light of the social utility of trying to save the passenger. *Id.* Therefore, the degree of risk in that situation might only rise to the level required for manslaughter. *Id.* That example is in contrast with a Texas case where a defendant fired two bullets into the side of the caboose of a passing train. *Id.* (citing *Banks v. State*, 211 S.W. 217 (Tex. Crim. 1919)). Under the circumstances of that case, it was more likely that someone would not be killed than that someone would be. *Id.* When considering the area of the inside of the caboose filled by vital organs of its human occupants, perhaps there was no more than a five percent chance that one would be killed by this conduct. *Id.* The probability of death in the shooting case might be far less than that of the driving example. However, "[i]n view of the lack of social utility in shooting into the side of the caboose, the risk of 5% was held enough for murder in that case." *Id.*

These types of reckless conduct that create a very high degree of risk and include little or no social utility amount to a disregard for human life sufficient to constitute malice and should, therefore, be punishable as murder when the conduct results in death. Reckless conduct creating lesser degrees of risk or perhaps including a higher degree of social utility do not show malice and should, therefore, be punishable by manslaughter when the conduct results in death. Though there is not a clear-cut distinction between these types of conduct, it is clear that I.C. § 18-4006's categorization of the reckless operation of a firearm as involuntary manslaughter will not be nullified by allowing a finding of malice where the shooter's reckless conduct amounts to such a high degree of risk that it is essentially a disregard for human life.

The State presented evidence in this case that: (1) Herrera was in possession of the gun when it discharged; (2) the gun was held to Stefanie's forehead at the moment it discharged; (3) the gun could not discharge without the trigger being pulled; (4) Herrera was at least partially under the influence of drugs at the time of the shooting; (5) Herrera and Stefanie were arguing in the moments leading up to the shooting; and (6) Herrera had experience in shooting guns. Given such circumstances, the question of second degree murder was properly submitted to the jury. Furthermore, this evidence was sufficient to support the jury's verdict, with or without the objectionable evidence identified in Section III.B.

6

**B.      Testimony elicited at trial unfairly prejudiced Herrera.**

For questions of admissibility of evidence, the Court employs a mixed standard of review: "First, whether the evidence is relevant is a matter of law that is subject to free review. Second, we review the district court's determination of whether the probative value of the evidence outweighs its prejudicial effect for an abuse of discretion." *State v. Shackelford*, 150 Idaho 355, 363, 247 P.3d 582, 590 (2010) (internal citation omitted). Abuse-of-discretion review requires an examination of "(1) whether the court correctly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of its discretion and consistently within the applicable legal standards; and (3) whether the court reached its decision by an exercise of reason." *Id.* Should the Court find error in the evidentiary rulings of the district court, we must then determine whether such error was "harmless." *State v. Moses*, 156 Idaho 855, 867, 332 P.3d 767, 779 (2014).

Herrera argues four witnesses at trial provided inappropriate testimony concerning his alleged prior acts and hearsay statements allegedly made by Stefanie in the weeks leading up to her death.[2] He argues that the majority of this testimony was irrelevant and that the prejudicial effect substantially outweighed any minimal probative value there may have been. The State responds that Stefanie's statements were relevant to show she was unhappy in her relationship with Herrera and intended to end it. It further responds that any risk of unfair prejudice to Herrera was alleviated by the district court's limiting instructions. We agree with Herrera.

"Hearsay" is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." I.R.E. 801(c); *State v. Trevino*, 132 Idaho 888, 894, 980 P.2d 552, 558 (1999). Hearsay evidence is generally inadmissible except as provided in the Idaho Rules of Evidence or other rules promulgated by the Court. I.R.E. 802. There are several exceptions to the general rule

---

[2] We refer to these statements as "hearsay statements" because the district court stated both at the hearing on the admissibility of evidence and at trial that it was admitting the statements under I.R.E. 803(3), which provides for the admission of hearsay statements of the declarant's then-existing state of mind. However, the district court also specifically instructed the jury that the statements were not to be considered for the truth of any matters asserted therein, which seems to take the statements outside the scope of the definition of "hearsay." We recently reiterated in *State v. Abdullah* that statements circumstantially showing a declarant's state of mind, but not stating it, may be admissible for a non-hearsay purpose, in which case, an analysis under the hearsay rules need not be undertaken. 158 Idaho 386, 437, 348 P.3d 1, 52 (2015). We further stated that "[s]ince the declaration is admissible in either event, it seems of no practical importance to determine in a given instance whether the declaration offered to show the declarant's existing state of mind is technically hearsay or non-hearsay." *Id.* (quoting *State v. Radabaugh*, 93 Idaho 727, 731, 471 P.2d 582, 586 (1970)). Therefore, we do not rule on the issue of whether these challenged statements amount to hearsay statements or not. Additionally, although we also refer to the statements as "state-of-mind evidence," as explained below, the statements actually have quite a tenuous relationship to the declarant's state of mind.

against hearsay. *See* I.R.E. 803. One such exception is: "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." I.R.E. 803(3).

Statements of the declarant's state of mind "may be admitted only after a determination that (1) the declaration is relevant, and (2) the need for and value of such testimony outweighs the possibility of prejudice to the defendant." *Shackelford*, 150 Idaho at 364, 247 P.3d at 591. There are four well-defined categories under which a homicide-victim-declarant's state of mind is relevant due to the legal theories presented in the case, such as where the defendant argues: (1) he or she acted in self-defense, (2) the victim committed suicide, (3) the killing was accidental, or (4) there is a specific *mens rea* in issue. *Id.* However, even where the evidence falls into one of these categories, the court must balance the relevance of such evidence against its possible prejudicial effect. *State v. Goodrich*, 97 Idaho 472, 477, 477 n. 7, 546 P.2d 1180, 1185, 1185 n. 7 (1976) (noting the four categories under which the state-of-mind evidence is generally accepted as relevant, but going on to say "[a]s with the admissibility of any piece of evidence, where the probative value of the statement is substantially outweighed by the danger of unfair prejudice to the defendant, this evidence should be excluded."); I.R.E. 403. The four categories relate primarily to relevancy and do not negate the need for an I.R.E. 403 balancing test. *Goodrich*, 97 Idaho at 477, 546 P.2d at 1185.

Prior to trial, the district court held a hearing to address the admissibility of certain evidence, including the testimony of Kaytlin Comack, Eunice McEwen, Bobbie Jo Riddle, and Susie Comack. Following that hearing, the court ordered among other things that (1) the testimony of these four witnesses as to statements made by Stefanie was admissible under I.R.E. 803(3) only as it bore upon Stefanie's mental condition at the time she made the statements, and (2) any testimony regarding bruises seen on Stefanie was excluded under I.R.E. 403. Specifically regarding Riddle's testimony, the court also ruled at the hearing that she would not be permitted to testify regarding fights between Stefanie and Herrera. At trial, the State offered testimony from each witness purporting to show Stefanie's state of mind concerning her relationship with Herrera.

Kaytlin Comack, Stefanie's sister, provided testimonial foundation for a series of Facebook messages sent between her and Stefanie the night before the shooting. Those messages

8

were entered into evidence and provided:

> **Stefanie Comack**: Kayt, i feel like a shitty sister. I'm sorry about all those things i said to you when you were having Trenton. I should have been there. I couldn't get D.J. or Trenton anything for Christmas and i feel like shit about it. I couldn't get anyone anything.

> **Kaytlin Comack**: I'm on moms phone and it will only let me read the first line but just so you know I love you and I'm sorry too I just wanted u at the hospital and I want you back as my sister I miss you sooo much and joes an ass bugs YOUR SO BEAUTIFUL don't let him bring you down

> **Stefanie Comack**: Thanks but it's ok i know i'm not pretty and it doesn't bother me anymore. Please don't tell any1 it does embarras me thAt even my boyfriend thinks that. I'm starting to realize he doesn't care. Y are people so mean. I hate myself so much i Don get out of bed 4hrs after i wake up. Plz dont tell any1 anythin ive said 2 u. Itl just embarras me. Im starting to Realize he really doesn't care. I thought i'd be alot more sad about it but i think i might hate him to much to be sad.

> **Kaytlin Comack**: hes a loser dude and you dont need to listen to him you really are pretty. when are you coming down here were all already here do you want to come stay the night tonight? itll be just me u dj n Trenton. dont hate yourself you have way to much going for ;you i love you bug and you have to quit with he throwing up because you are getting waaay skinny and youve always been perfect bugs. we miss you and joes just mean if hes going to treat you the way he does he doesnt deserve you everyone agrees i know it seems like were always on your shit but its just because were all worried about you and love you.

The State also asked Kaytlin whether Stefanie spoke to her in the weeks leading up to the shooting about Stefanie's relationship with Herrera. When the State inquired as to when these conversations occurred, Kaytlin answered that the conversations occurred around Thanksgiving, when Stefanie arrived at dinner with handprint-shaped bruises. She then repeated this testimony when the State stated that it had not heard Kaytlin's response. Following a discussion with the attorneys and the denial of a motion for mistrial by Herrera, the court instructed the jury to disregard Kaytlin's statements regarding bruises.

The Facebook messages, for which Kaytlin provided testimonial foundation, do contain statements of Stefanie's state of mind the night before the shooting. She stated she felt like Herrera did not care about her and she felt like she might hate him. These messages also contain disparaging remarks about Herrera, such as referring to him as "an ass," "a loser," and as being mean to Stefanie. While these messages do not paint Herrera in a flattering light, they do not alone create unfair prejudice to Herrera, and they may have some probative value on the question of Stefanie's state of mind. However, although the court instructed the jury to disregard it,

Kaytlin also testified in the presence of the jury about bruises on Stefanie. The court noted the prosecutor did not appear to intentionally elicit any testimony about the bruises, and that there was no direct connection in the testimony to link Herrera to the bruising. However, the logical inference would be to connect the subject matter of the question asked with the subject matter of the answer. Kaytlin was asked about when a conversation occurred between Stefanie and her regarding Stefanie's relationship with Herrera. In response, Kaytlin brought up handprint-shaped bruises on Stefanie. Given that Kaytlin mentioned the bruises in response to a question about Herrera's and Stefanie's relationship, the jury would most likely conclude that the bruising was caused in connection with that relationship. The court specifically ruled at the hearing on the motion in limine that no testimony regarding bruising would be permitted or admitted because its prejudicial effect substantially outweighed any probative value that could come from such testimony. We agree that testimony suggesting Herrera was abusive is highly prejudicial.

Stefanie's friend, Eunice McEwen, testified that approximately one week before Stefanie was killed, they had a conversation during which Stefanie told Eunice about an event that had transpired between her and Herrera. Eunice testified, "[Stefanie] said that her and [Herrera] got into a fight and he hit her head against the shifter and choked her and put a gun to her head and said that, if she didn't shut up, that he was going to shoot her." Eunice further stated, "[Stefanie] said that she broke up with [Herrera] and that he yelled at her before and stuff like that." This testimony was allowed by the court with a limiting instruction that it was only to be considered to evidence Stefanie's state of mind.

Eunice's testimony did not contain any statements of Stefanie's state of mind, and it was highly prejudicial to Herrera. Although the State argues it called these witnesses to evidence Stefanie's state of mind, it did not ask Eunice questions directed toward that end, instead asking whether Stefanie told Eunice "about some event that had transpired with Joe Herrera." This focus on the *event* of Herrera's alleged threat suggests the State desired to do exactly what is proscribed by rule 803(3), relay a statement of Stefanie's memory of an event in order to prove the fact remembered. Indeed, Stefanie telling Eunice about the threat could not show Stefanie's state of mind (e.g., fear of Herrera because of the threat) unless the jury accepted the event as true. Eunice also testified that Stefanie broke up with Herrera, which supports the State's theory that Stefanie desired to end the relationship. However, there were other witnesses who could have helped establish this desire in a much less prejudicial way. Allowing testimony about an

event so similar to the State's version of the facts makes it especially likely that the jury would not be able to make a decision on Herrera's state of mind at the time of the shooting without considering the testimony about him having intentionally threatened to shoot Stefanie in the past.

Stefanie's father's girlfriend, Bobbie Jo Riddle, testified that Stefanie told her in December 2011 that Stefanie was having trouble breaking up with Herrera because each time she did so Herrera threatened to kill himself. The State followed up with the following exchange:

The State: Okay. And what did she tell you about why she was leaving him?

Riddle: Well, she said that he sometimes got mean and she—

The State: Let me ask you something specifically. Did she talk about Joe having mistreated her in any way?

Riddle: Yes.

The State: What did she say Joe had done to her?

Riddle: He slapped her around and choked her.

Following a discussion with the attorneys, the court instructed the jury to disregard Riddle's statements about slapping and choking.

At the pre-trial hearing, the court heard what the State intended to have Riddle testify to. It ruled she would be permitted to testify as to Stefanie's statements that Herrera threatened to kill himself when Stefanie tried to break up with him, but she would not be permitted to provide the rest of her offered testimony about fights and abuse. The State knew Riddle had previously testified that Herrera was abusive to Stefanie, and it also knew that such testimony was specifically excluded. Despite this knowledge, the State asked Riddle whether Stefanie had said Herrera mistreated her and what she said he had done to mistreat her. While Herrera has not raised the issue of prosecutorial misconduct in connection with this line of questioning, it appears obvious to this Court that the State's questions were specifically designed to elicit testimony regarding those matters the trial court had previously ruled inadmissible. Not only was the questioning inappropriate under the circumstances, the testimony does not go to evidence Stefanie's state of mind other than to show that she may have desired to break up with Herrera at some point.

Stefanie's mother, Susie Comack, testified about a conversation with Stefanie two weeks before the shooting. Susie testified that Stefanie told her Herrera had broken Stefanie's phone because Stefanie wanted to call Susie to ask for a ride home. Susie further testified that in the first couple weeks of December 2011, Stefanie asked to borrow her car to go see Herrera because

11

he had threatened to kill himself. Finally, Susie testified that on the night before the shooting, Susie told Stefanie "that this was no way to live, that she did not need to live like this." Susie testified that Stefanie responded, "Mom, you don't understand. He's psycho." The only statement of Stefanie's state of mind included in Susie's testimony is that Stefanie thought Herrera was "psycho." This statement has minimal probative value to show Stefanie intended to end the relationship as the State claimed. The balance of Susie's testimony regarding Stefanie's statements consisted of statements of memory that do not show Stefanie's state of mind.

Normally, the Court would at this point consider whether the district judge erred in admitting the state of mind evidence and, if so, whether or not the error was harmless. *Moses*, 156 Idaho at 867, 332 P.3d at 779. However, under the particular circumstances of this case, we need not pursue that course of action. It appears from the record that the majority of the State's asserted state of mind evidence was simply an attempt to present to the jury Herrera's alleged past conduct. We agree with the California Supreme Court that,

> [State of mind] testimony is not admissible if it refers solely to alleged past conduct on the part of the accused. This is so because to try and separate state of mind from the truth of the charges is an almost impossible task. The serious prejudice from such evidence is obvious. When the declarations are of such a nature as to be obviously prejudicial, and where any possible proper benefit to the prosecution is far outweighed by its prejudicial effect to the accused, such evidence should be excluded.

*People v. Hamilton*, 362 P.2d 473, 480 (Cal. 1961) (rev'd on other grounds). It is difficult to see how the testimony purported to be offered as bearing on Stefanie's state of mind could have fulfilled that purpose. Rather, it appears to have been intended to show previous bad acts of Herrera.

Even more concerning is the rather transparent violation of the limitations imposed by the district court on the testimony of these witnesses. The order specifically excluded testimony regarding Herrera's prior bad acts, which shed little light on the charges he was facing, but which held great potential to increase the likelihood of a conviction. Despite the court's order, the State asked questions that appeared to be deliberately designed to elicit the exact testimony that the district court had specifically prohibited. A party's deliberate violation of an order excluding evidence with little relevance but with great potential for prejudice is an attack on the fairness of the proceeding and cannot be countenanced. Thus, in order to address the violation of the court's order, and even in light of other evidence supporting the conviction, we find it appropriate in the

particular circumstances presented by this case to find that Herrera was denied the opportunity of a fair trial. The judgment of conviction must therefore be vacated.

## IV.

## CONCLUSION

We vacate the judgment of conviction. The case is remanded for further proceedings consistent with this opinion.

JUSTICES EISMANN, BURDICK, W. JONES and HORTON CONCUR.