# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 44596-2016

<table>
<tr><td>STATE OF IDAHO,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>    Plaintiff-Respondent,</td><td>)</td><td>Boise, June 2018 Term</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Filed: September 7, 2018</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>JOSEPH DUANE HERRERA,</td><td>)</td><td>Karel A. Lehrman, Clerk</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>    Defendant-Appellant.</td><td>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
</table>

Appeal from the District Court of the First Judicial District of the State of Idaho, Benewah County.  Hon. John T. Mitchell, District Judge.

Appellant's conviction and sentence are <u>affirmed</u>.

Eric D. Fredericksen, Idaho State Appellate Public Defender, attorneys for appellant. Ben P. McGreevy argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, attorneys for respondent. Kenneth K. Jorgensen argued.

_____

BEVAN, Justice

## I.  NATURE OF THE CASE

Joseph Herrera ("Herrera") appeals from his conviction for second-degree murder after a second trial. On appeal, Herrera argues that: (1) the State vindictively prosecuted him by adding a sentencing enhancement; (2) the district court erred when it failed to conduct a sufficient inquiry into his request for substitution of appointed counsel; (3) the district court abused its discretion when it overruled objections to a detective's testimony regarding gunshot residue analysis; (4) the State committed prosecutorial misconduct in closing arguments; (5) the accumulation of errors deprived him of a right to a fair trial; and (6) the district court judge imposed a vindictive sentence after the second trial. We affirm Herrera's conviction and sentence.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts of this case are set forth in *State v. Herrera*, 159 Idaho 615, 364 P.3d 1180 (2015). On December 25, 2011, Herrera and his girlfriend, Stefanie Comack, were arguing when she was shot and killed. A jury convicted Herrera of second-degree murder and he was sentenced to life in prison with twenty-two years fixed. Herrera appealed, and this Court found that testimony from four witnesses unfairly prejudiced Herrera; thus, we vacated his conviction and remanded the case for further proceedings.

On remand, the case was assigned to a new judge, a new prosecutor took over the case, and Herrera was appointed new defense counsel. Herrera was retried, and a new jury found Herrera guilty of second-degree murder. However, this time Herrera was sentenced to life in prison with thirty-years fixed. Herrera timely appealed.

## III. ISSUES ON APPEAL

**1.** Whether Herrera's due process rights were violated through vindictive prosecution.

**2.** Whether the district court conducted a sufficient inquiry into Herrera's request for substitution of counsel.

**3.** Whether the district court abused its discretion by overruling objections to Detective Berger's testimony regarding gunshot residue analysis.

**4.** Whether the State committed prosecutorial misconduct during closing arguments.

**5.** Whether the accumulation of errors deprived Herrera of his right to a fair trial.

**6.** Whether Herrera's due process rights were violated through vindictive sentencing.

## IV. STANDARD OF REVIEW

The standard of review applied by this Court depends on whether a contemporaneous objection was made after an error occurred at trial. If the alleged error was followed by a contemporaneous objection at trial, appellate courts employ the harmless error test articulated in *Chapman v. California*, which provides "[w]here the defendant meets his initial burden of showing that a violation occurred, the State then has the burden of demonstrating to the appellate court beyond a reasonable doubt that the constitutional violation did not contribute to the jury's verdict." *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010) (citing *Chapman v. California*, 386 U.S. 18 (1967)). "In Idaho, the harmless error test established in *Chapman* is now applied to all objected-to error." *Id.* at 221, 245 P.3d at 973.

Alternatively, when an "alleged error was not followed by a contemporaneous objection, it shall only be reviewed by an appellate court under Idaho's fundamental error doctrine." *Id.* at

228, 245 P.3d at 980. Such a review requires the defendant to prove that the error: "(1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision); and (3) was not harmless." *Id*. The defendant may satisfy the burden of showing that the error was not harmless by "proving there is a reasonable possibility that the error affected the outcome of the trial." *Id*. at 226, 245 P.3d at 978. "If the defendant persuades the appellate court that the complained of error satisfies this three-prong inquiry, then the appellate court shall vacate and remand." *Id*. at 228, 245 P.3d at 980.

## V. ANALYSIS

### A. The State's decision to add the sentencing enhancement did not amount to vindictive prosecution.

After the case was remanded the prosecutor moved to amend the Information to add a sentencing enhancement for use of a firearm under Idaho Code section 19-2520. The State provided several reasons in support of its motion for a sentencing enhancement in the new trial, i.e., the prosecutor was new to the case and would have included the enhancement in the first trial if he had been involved; as a result of the appeal several witnesses would be prevented from testifying, reducing the amount of evidence available to the State at trial; the Supreme Court's decision contemplated that Herrera could be convicted for manslaughter, a possibility that the earlier prosecutor likely did not contemplate given the evidence available to him at the time of trial; the amendment would not add any new charges, but instead allowed a higher sentence if Herrera was convicted of manslaughter; and the State wanted the opportunity to argue for the same determinate sentence found by the previous trial court.

Herrera objected, arguing that the enhancement was an attempt to punish him for his successful appeal. The district court granted the motion to amend after finding that the State was not attempting to charge Herrera with a new or separate crime, i.e., because there was no increase, additional charge, or possibility of increased penalty above second-degree murder (the crime Herrera was convicted of in the first trial), the sentencing enhancement did not increase the potential sentence above the original charge. After trial, the jury found Herrera guilty of second-degree murder—not manslaughter. Accordingly, the State dismissed the firearm enhancement. However, the prosecutor subsequently referred to the enhancement while making his sentencing recommendation to the court. Herrera objected, asserting that the State could not raise that

3

argument after it had been dismissed. The district court found that the prosecutor's references to the enhancement were argument and overruled Herrera's objection.

Herrera's argument that the State vindictively prosecuted him is twofold. First, Herrera asserts that the State's request to add a firearm sentencing enhancement in the new trial punished him for exercising his right to challenge his conviction. Second, Herrera argues that the State impermissibly referenced the enhancement after it was dismissed as a ploy to convince the district court to increase his sentence. Herrera advances an argument that the prosecutor violated his general duty of candor to the court when he "lied to the district court, defense counsel and Herrera when he claimed the firearm enhancement would only be used to protect his original sentence, and that, notwithstanding his dismissal of the charge after hearing the verdict, he breached an implied promise when he argued in favor of an increased penalty based on the intent of the dismissed firearm enhancement at sentencing."

"This Court exercises free review in determining whether 'constitutional requirements have been satisfied in light of the facts' found by the trial court." *State v. Crowe*, 131 Idaho 109, 111, 952 P.2d 1245, 1247 (1998) (quoting *State v. Weber*, 116 Idaho 449, 452, 776 P.2d 458, 461 (1989)). "[T]he United States Supreme Court has held a defendant's due process rights are violated when a prosecutor vindictively retaliates against a defendant for exercising a legally protected right." *State v. Ostler*, 161 Idaho 350, 352, 386 P.3d 491, 493 (2016) (citing *Blackledge v. Perry*, 417 U.S. 21, 27–28 (1974)). "The Supreme Court has reasoned that '[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort. . . .'" *Id.* (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)). Accordingly, it is not constitutionally permissible for the State to bring a more serious charge in response to a defendant's invocation of his statutory right to a new trial after an appeal. *Blackledge*, 417 U.S. at 28 ("A person convicted of an offense is entitled to pursue his statutory right to a trial de novo, without apprehension that the State will retaliate by substituting a more serious charge for the original one, thus subjecting him to a significantly increased potential period of incarceration.").

However, "the Due Process Clause is not offended by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a realistic likelihood of 'vindictiveness.'" *Blackledge*, 417 U.S. at 27. To prove prosecutorial vindictiveness, "a defendant must show either actual vindictiveness or apparent vindictiveness." *Ostler*, 161 Idaho

4

at 352, 386 P.3d at 493 (citing *United States v. Goodwin*, 457 U.S. 368, 372–75 (1982)). "To show actual vindictiveness a defendant may 'prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do.'" *Id*. at 352–53, 386 P.3d at 493–94 (citing *Goodwin*, 457 U.S. at 384). "[O]nly in a rare case would a defendant be able to overcome the presumptive validity of the prosecutor's actions through such a demonstration." *Id*. at 353, 386 P.3d at 494 (internal quotation omitted). Conversely, apparent vindictiveness is proven by a "realistic likelihood of 'vindictiveness.'" *Id*. (citing *Blackledge*, 417 U.S. at 27).

> a. *The State did not vindictively prosecute Herrera by requesting a sentencing enhancement.*

Herrera bears the burden of proving that the State's decision to add the sentencing enhancement was motivated by a desire to punish him for his appeal. *See Ostler*, 161 Idaho at 352–53, 386 P.3d at 493–94. Herrera argues that the State's reasons are constitutionally infirm because: (1) the change in prosecutor did not make the enhancement any less vindictive, especially since the prosecutor was aware that the 2013 conviction had been vacated, causing him to be "burdened with the retrial of an already-convicted defendant;" (2) by arguing that the new trial might result in a manslaughter conviction, the prosecutor was seeking to protect a sentence obtained through the original prosecutor's misconduct; and (3) the prosecutor's argument that the former prosecutor likely did not anticipate that Herrera could be convicted of manslaughter was fictional because the jury had been instructed on the lesser included offenses of voluntary and involuntary manslaughter at the first trial. Ultimately, Herrera claims that "it is clearly malicious motives that would impel a prosecutor to vindictively seek a sentence for second-degree murder, for conduct the jury found *did not* constitute second-degree murder."

We do not find Herrera's arguments to be persuasive. First, the authority upon which Herrera relies involves the addition of new felony charges at a new trial, not a sentencing enhancement. *See Thigpen v. Roberts*, 468 U.S. 27, 28–29 (1984) (defendant was convicted of four misdemeanors and while his appeal was pending he was convicted of manslaughter by a different jury); *See also Blackledge*, 417 U.S. at 22–23 (defendant was convicted of misdemeanor assault with a deadly weapon, and after filing a notice of appeal the prosecutor obtained an indictment from a grand jury charging the defendant with felony assault with a deadly weapon). These cases are inapposite to the case at hand because the district court specifically concluded that the sentencing enhancement was not an additional charge and that

5

there was no possibility that Herrera would face an increased penalty from the crime he was convicted of in the first trial, i.e., second-degree murder. Similarly, Herrera is off-base in suggesting that the prosecutor must have been driven by "malicious motives" to seek a sentence enhancement as a hedge against the possibility that Herrera could be found guilty of a lesser offense. In order to prove vindictive prosecution, Herrera must have been subjected to a heavier penalty for the *same act originally charged*. However, as recognized by the district court, Herrera had already been convicted of second-degree murder; thus, even if the jury found Herrera guilty of a lesser offense, the sentencing enhancement could not cause a harsher penalty than the punishment that Herrera was originally facing.

Ultimately, Herrera failed to demonstrate that the State added the sentencing enhancement to punish him for his appeal. Instead, we conclude that the prosecutor provided a legitimate explanation, i.e., he was concerned that the reduced evidence carried a higher probability that Herrera could be convicted of manslaughter and he wanted the opportunity to argue for the same determinate sentence found by the previous trial court. Moreover, even assuming that the State committed misconduct by requesting the sentencing enhancement, the misconduct was harmless because the enhancement was dismissed prior to any consideration by the jury.

> *b. The State did not vindictively prosecute Herrera when the prosecutor discussed the dismissed sentencing enhancement at the sentencing hearing.*

Herrera also alleges that the State committed prosecutorial misconduct by referencing the sentencing enhancement after the enhancement had been dismissed. Indeed, at the sentencing hearing the prosecutor noted that the State did not pursue the enhancement, but "if separately proved" it could provide an additional fifteen-year term. The fact that a firearm was used in the commission of the crime was incontrovertible. The trial court was certainly aware of it and the prosecutor's mentioning of the dismissed enhancement at sentencing did not impermissibly emphasize that fact in an effort to increase the potential sentence. *See State v. Sheahan*, 139 Idaho 267, 280, 77 P.3d 956, 969 (2003) (Both sides have traditionally been afforded considerable latitude in argument to the jury and are entitled to discuss fully, from their respective standpoints, the evidence and the inferences to be drawn therefrom.)

**B. Herrera failed to provide this Court with a sufficient record to determine whether the district court abused its discretion with regard to his request for substitute counsel.**

6

Prior to trial, Herrera filed a motion to replace his defense attorney, citing concerns that: (1) his attorney was not going to be able to sufficiently prepare for trial; (2) the two had fundamental differences in trial strategy; and (3) his attorney had previously represented the victim's siblings on unrelated misdemeanor charges. The record is sparse concerning the district court's inquiry into Herrera's concerns. At a hearing Herrera's defense counsel voiced his own concerns about the amount of time it would take to get ready for trial, but indicated that he believed he could be adequately prepared. Defense counsel also informed the court that there were "concerning" fundamental differences regarding trial tactics that he did not want to discuss in open court. The State took no position on Herrera's motion other than wanting to ensure Herrera's constitutional rights were not violated, offering defense counsel the opportunity to discuss any issues with the court outside the presence of the State.

Thereafter, before the court denied Herrera's motion, a brief discussion took place regarding the third concern, that defense counsel had previously represented the victim's siblings on unrelated misdemeanor charges:

> THE COURT: All right. Here's my ruling. I am denying the motion to replace the defense attorney . . . . Mr. Herrera, you have a right to be represented by an attorney . . . . You don't have a right to pick and choose who represents you, and I trust [defense counsel] to assess the conflict of interest or lack thereof under the Idaho Rules of Professional Conduct and he is telling me that he does not see a conflict under that. As for these other fundamental differences, I don't have any evidence of that, and so without having any evidence of that I'm denying the motion. You – well, and I'll just leave it at that. What I haven't heard, and I'm not going to hear any more evidence of it now because I don't have a motion to continue, is how much time [defense counsel] has spent on Mr. Herrera's case, and I'm here to tell you, Mr. Herrera, that [defense counsel] is a very experienced attorney. He has a bar number close to my father's than it is to me and I am not a young man, so you have a very experienced attorney representing you, and I don't have a motion to continue in front of me, and I'm not going to hear any more on that issue today. That's my decision. We're done. We're moving on.

This Court reviews a district court's determination as to whether to appoint substitute counsel for an abuse of discretion. *State v. Nath*, 137 Idaho 712, 715, 52 P.3d 857, 860 (2002). The test to determine whether a trial court has abused its discretion consists of four parts, which include whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason. *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

7

Article I, section 13 of the Idaho Constitution guarantees a criminal defendant reasonably competent assistance of counsel. *Dunlap v. State*, 141 Idaho 50, 58, 106 P.3d 376, 384 (2004) (citing *State v. Wood*, 132 Idaho 88, 95, 967 P.2d 702, 709 (1998)). However, the right to counsel does not grant a defendant the right to an attorney of their choice. *State v. Lippert*, 145 Idaho 586, 594, 181 P.3d 512, 520 (Ct. App. 2007) (citing *State v. Clark*, 115 Idaho 1056, 1058, 772 P.2d 263, 265 (Ct. App. 1989)). "[M]ere lack of confidence in otherwise competent counsel is not necessarily grounds for substitute counsel in the absence of extraordinary circumstances." *State v. McCabe*, 101 Idaho 727, 729, 620 P.2d 300, 302 (1980) (internal citations omitted).

"Upon being made aware of a defendant's request for substitute counsel, the trial court must afford the defendant a full and fair opportunity to present the facts and reasons in support of a motion for substitution of counsel." *State v. Gamble*, 146 Idaho 331, 336, 193 P.3d 878, 883 (Ct. App. 2008) (citing *State v. Clayton*, 100 Idaho 896, 898, 606 P.2d 1000, 1002 (1980)). *Compare Clayton*, 100 Idaho at 898, 606 P.2d at 1002 (this Court found that the defendant was given ample opportunity to recite any underlying facts to give rise to his subjective beliefs concerning appointed counsel's alleged incompetency, noting that after the defendant "passed up the opportunity to create his own record, he cannot now complain that there is none."), *with Nath*, 137 Idaho at 715, 52 P.3d at 860 (this Court found that the defendant was not afforded a full and fair opportunity to present the facts when he was not permitted to speak on the subject or given the opportunity to explain his problems.). However, the right to present facts and reasons in support of the motion to substitute counsel does not require the trial judge to act as an advocate for the defendant in a criminal proceeding. *Clayton*, 100 Idaho at 898, 606 P.2d at 1002.

The record reflects that the district court's inquiry into Herrera's request for substitute counsel was limited. First, Herrera alleged that his attorney was not prepared for trial. The district court effectively dismissed this concern based on the fact that there was no current motion to continue. Herrera had no opportunity to speak on this issue because the district court directed all questions to Herrera's counsel. Second, defense counsel raised the issue that he and Herrera had "concerning" fundamental differences in trial strategy. The district court made no inquiries into this issue; rather, the judge simply reasoned "I don't have any evidence of that, and so without having any evidence of that I'm denying the motion."

Regarding Herrera's third claim, the judge provided him the opportunity to speak briefly regarding concerns that his attorney had previously represented the victim's siblings on unrelated misdemeanor charges. The extent of Herrera's opportunity to speak was as follows:

> THE COURT: And is there anything that you want to tell me regarding the motion, Mr. Herrera?
>
> THE DEFENDANT:  Um, yes, sir. I also would like the [c]ourt to know that [defense counsel] represented Jack and Kaytlin Comack. Those are siblings to Stefanie. Um, I asked him verbally and he told me he didn't remember or recall, so I sent him two certified letters, and um, right there on the bottom where the black is will indicate his response and when -- the date up date is when I got the response back.
>
> THE COURT: So --
>
> THE DEFENDANT: I had heard from other inmates that --
>
> THE COURT: I'm going to hand back the March 7th letter from [defense counsel] to you --
>
> THE DEFENDANT: Down in the black --
>
> THE COURT: -- let me finish.
>
> THE DEFENDANT: Sorry, sir.

While this colloquy may not have been a sufficient opportunity for Herrera to present the facts and reasons in support of his motion for substitution of counsel, it appears Herrera failed to provide this Court with a proper record on appeal, i.e., the trial judge apparently reviewed several letters prior to making his ruling, which were not included in the record. "The party appealing a decision of the district court bears the burden of ensuring that this Court is provided a sufficient record for review of the district court's decision." *La Bella Vita, LLC v. Shuler*, 158 Idaho 799, 805, 353 P.3d 420, 426 (2015). On appeal, Herrera reasons that "while an attorney-client communication was apparently handed to the district court, the court did not retain it or rely on it in ruling on the motion, saying it was handing the letter(s) back 'because [he did not] see how those go to the representation of other Comacks.'" Thus, the judge reviewed the letters and stated on the record he was handing them back. Herrera did not object to this procedure nor did he request to keep the letters in the record. As a result we have no way to verify whether the judge relied on the letters, or what the letters contained that may have impacted the judge's decision. In the absence of a complete record this Court is left to presume that the evidence justifies the decision below. *See State v. Koch*, 157 Idaho 89, 95, 334 P.3d 280, 286 (2014).

Accordingly, we hold that the district court did not abuse its discretion in denying Herrera's motion for substitute counsel.

### C. The district court's decision to admit a portion of Detective Berger's testimony regarding gunshot residue analysis was harmless.

At trial the State recalled a witness, Detective Berger, to clarify whether there was gunshot residue or blood splatter analysis performed on Herrera or Stefanie Comack. Herrera objected based on lack of foundation. The district court overruled the objection and permitted Detective Berger to testify regarding what he did and didn't do, and what tests he did and didn't order. Thereafter, Detective Berger proceeded to testify concerning: (1) his familiarity with gunshot residue; (2) his experience with gunshot residue as a detective; and (3) limitations of gunshot residue analysis.

On appeal, Herrera argues that the State failed to lay the required foundational evidence showing that Detective Berger was qualified as an expert on the topic of gunshot residue analysis. Specifically, Herrera claims that Detective Berger did not have practical experience or special knowledge that would qualify him as an expert on gunshot residue analysis; thus, the district court abused its discretion by overruling Herrera's objections and permitting Detective Berger's testimony.

Because Herrera contemporaneously objected to the testimony at trial, we employ the harmless error test articulated in *Chapman*, which provides "where the defendant meets his initial burden of showing that a violation occurred, the State then has the burden of demonstrating to the appellate court beyond a reasonable doubt that the constitutional violation did not contribute to the jury's verdict." *Perry*, 150 Idaho at 227, 245 P.3d at 979.

"A district court has broad discretion in determining whether a witness is qualified as an expert." *Weeks v. E. Idaho Health Servs.*, 143 Idaho 834, 837, 153 P.3d 1180, 1183 (2007) (citing *Warren v. Sharp*, 139 Idaho 599, 605, 83 P.3d 773, 779 (2003)). "Admissibility of expert testimony is also a matter committed to the discretion of the trial court and will not be overturned absent an abuse of that discretion." *Id*. (citing *Athay v. Stacey*, 142 Idaho 360, 366, 128 P.3d 897, 903 (2005)). Similarly, "[t]his Court reviews a district court's conclusion that evidence is supported by proper foundation under an abuse of discretion standard." *State v. Sheahan*, 139 Idaho 267, 276, 77 P.3d 956, 965 (2003) (citing *State v. Groce*, 133 Idaho 144, 146, 983 P.2d 217, 219 (Ct. App. 1999)). As noted above, this Court's test to determine whether a trial court has abused its discretion consists of four parts, whether the court: (1) correctly perceived the

issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason. *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194.

Idaho Rule of Evidence 702 sets forth the standard related to expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

I.R.E. 702. In short, "[a] qualified expert is one who possesses 'knowledge, skill, experience, training, or education.'" *Weeks*, 143 Idaho at 837, 153 P.3d at 1183 (quoting I.R.E. 702). "Formal training is not necessary, but practical experience or special knowledge must be shown to bring a witness within the category of an expert." *Id*. (citing *Warren*, 139 Idaho at 605, 83 P.3d at 779). Further, "[t]he proponent of the testimony must lay foundational evidence showing that the individual is qualified as an expert on the topic of his or her testimony." *Id*. (internal citation omitted).

The crux of this issue is the substance of Detective Berger's testimony. At the outset, Detective Berger explained why he did not have a gunshot residue analysis performed. This testimony was based on Detective Berger's own experience and training; thus, we hold the district court properly allowed the testimony. However, thereafter the district court improperly permitted a portion of Detective Berger's testimony that commented on the limitations of gunshot residue:

> Q: Would you have concerns about the limitations of gunshot residue in terms of its ability to indicate forensically who shot the firearm?
>
> A: Yes.
>
> DEFENSE COUNSEL: Your Honor, that question I would object. There's not been sufficient foundation to qualify this person as an expert in gunshot residue and its analysis.
>
> THE COURT: That objection's overruled.
>
> A: The answer's yes.
>
> Q: Could you please describe the limitations of gunshot residue as a forensic tool?
>
> DEFENSE COUNSEL: Again, Your Honor, I would object on the grounds that this person has not been qualified as an expert, has not testified that he's been involved in the forensic analysis of gunshot residue; simply indicating that he's had some experience with it in investigations, but he's not participated in any analyzation of gunshot residue from a party, nor participated in how it is analyzed

11

or has he been qualified to testify as to what particles or what gunshot residue show or don't show. He's also not been disclosed as an expert by the State, and they're now asking him to be providing an expert opinion.

THE COURT: The objection's overruled.

A: The -- when you do a gunshot residue analysis, it doesn't quantify how much is on one person. It just tells you that gunshot residue is present, so there's really -- it sometimes is difficult to determine who was the one that fired the gun, but if they're in close proximity, they'll both have gunshot residue, just not a total quantity of what was on there.

Detective Berger went beyond his training and experience in the record by testifying on the limitations of gunshot residue analysis. Specifically, to understand and appreciate the limitations of gunshot residue analysis, an individual would first need to have practical experience or special knowledge in conducting such tests. *See Weeks*, 143 Idaho at 837, 153 P.3d at 1183 ("[f]ormal training is not necessary, but practical experience or special knowledge must be shown to bring a witness within the category of an expert"). The State did not provide a sufficient foundation to demonstrate that Detective Berger had ever performed, or could perform, a gunshot residue analysis. *See id.* ("[t]he proponent of the testimony must lay foundational evidence showing that the individual is qualified as an expert on the topic of his or her testimony."). Based upon the record, the detective was not qualified to offer an opinion on the limitations of such a test, and we hold his testimony was inadmissible.

Notwithstanding the foregoing, we find that the admission of Detective Berger's testimony was harmless based on the overwhelming evidence that Herrera shot Stefanie Comack. *See Perry*, 150 Idaho at 227, 245 P.3d at 979 ("where the defendant meets his initial burden of showing that a violation occurred, the State then has the burden of demonstrating to the appellate court beyond a reasonable doubt that the constitutional violation did not contribute to the jury's verdict."). In sum, the district court erred in overruling Herrera's objections to Detective Berger's testimony, but that error was harmless.

**D. The State did not commit prosecutorial misconduct in closing arguments.**

Herrera alleges that he was deprived of a fair trial as a result of the prosecutor's "relentless name-calling" during closing arguments. Specifically, Herrera asserts that the State committed prosecutorial misconduct when the prosecutor called him a liar more than twenty times. Further, Herrera claims that the prosecutor misrepresented the State's burden of proof, the evidence, and the law during closing arguments.

It is undisputed that Herrera did not contemporaneously object to the prosecutor's statements; thus the statements must be reviewed for fundamental error. Idaho's fundamental error test requires the defendant to prove that the error: "(1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision); and (3) was not harmless." *Perry*, 150 Idaho at 228, 245 P.3d at 980. "If the defendant persuades the appellate court that the complained of error satisfies this three-prong inquiry, then the appellate court shall vacate and remand." *Id.*

The Fifth and Fourteenth Amendments to the United States Constitution provide that no person shall be deprived of life, liberty, or property, without due process of law. U.S. Const. amends. V; XIV, § 1. The Idaho Constitution also guarantees that, "[n]o person shall be … deprived of life, liberty or property without due process of law." Idaho Const. art. I, § 13. While the due process clause does not guarantee an errorless trial, it requires that criminal trials be fundamentally fair. *Schwartzmiller v. Winters*, 99 Idaho 18, 19, 576 P.2d 1052, 1053 (1978). "Where a prosecutor attempts to secure a verdict on any factor other than the law as set forth in the jury instructions and the evidence admitted during trial, including reasonable inferences that may be drawn from that evidence, this impacts a defendant's Fourteenth Amendment right to a fair trial." *Perry*, 150 Idaho at 227, 245 P.3d at 979.

"Closing argument 'serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case.'" *State v. Phillips*, 144 Idaho 82, 86, 156 P.3d 583, 587 (Ct. App. 2007) (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)). The purpose of a closing argument is "to enlighten the jury and to help the jurors remember and interpret the evidence." *Id.* (internal quotation omitted). Generally, "both parties are given wide latitude in making their arguments to the jury and discussing the evidence and inferences to be made therefrom." *State v. Ehrlick*, 158 Idaho 900, 928, 354 P.3d 462, 490 (2015) (citing *State v. Dunlap*, 155 Idaho 345, 368, 313 P.3d 1, 24 (2013)). As a result, parties are entitled to explain "how, from their own perspectives, the evidence confirms or calls into doubt the credibility of particular witnesses" when making a closing argument. *Id.* (internal citation omitted). However, "[c]losing argument should not include counsel's personal opinions and beliefs about the credibility of a witness or the guilt or innocence of the accused." *Phillips*, 144 Idaho at 86, 156 P.3d at 587. Indeed, the prosecutor is prohibited from expressing any personal beliefs of a witness's credibility, unless the comment is

13

based solely on inferences from evidence presented at trial. *Id*. The prosecutor also "has a duty to avoid misrepresentation of the facts and unnecessarily inflammatory tactics." *State v. Moses*, 156 Idaho 855, 871, 332 P.3d 767, 783 (2014) (internal citation omitted). Still, "[p]rosecutorial misconduct during closing arguments will constitute fundamental error only if the comments were so egregious or inflammatory that any consequent prejudice could not have been remedied by a ruling from the trial court informing the jury that the comments should be disregarded." *State v. Lankford*, 162 Idaho 477, 501, 399 P.3d 804, 828 (2017) (citing *State v. Parker*, 157 Idaho 132, 146, 334 P.3d 806, 820 (2014)).

In *Ehrlick*, the defendant argued that the prosecutor expressed opinions on his credibility when in closing arguments he referred to Ehrlick as a liar and dishonest; thus committing prosecutorial misconduct. *Ehrlick*, 158 Idaho at 928, 354 P.3d at 490. On appeal, this Court held the prosecutor did not engage in misconduct by commenting on Ehrlick's credibility; rather we explained that "[a]t no point did the prosecutor advance his personal opinion or belief that Ehrlick was a liar. Instead, the prosecutor explained how the evidence illustrated that Ehrlick was dishonest during the investigation and later at trial." *Id*. Similarly, in *Lankford*, the prosecutor called Lankford a liar 16 times in closing argument. 162 Idaho at 499–500, 399 P.3d at 826–27. On appeal this Court found that "although the repeated use of the term 'liar' and its various grammatical forms is troubling and ill-advised, it did not rise to the level of prosecutorial misconduct." *Id*. This holding was predicated on the fact that the prosecutor's statements were supported by the evidence presented at trial, including Lankford's own admissions he had lied. *Id*. at 500, 399 P.3d at 827.

1.  *The State did not commit prosecutorial misconduct by referring to Herrera as a liar.*

First, Herrera argues that the State committed prosecutorial misconduct by referring to Herrera as a liar. It is well established that during closing arguments parties are entitled to explain "how, from their own perspectives, the evidence confirms or calls into doubt the credibility of particular witnesses." *Ehrlick*, 158 Idaho at 928, 354 P.3d at 490. However, "[c]losing argument should not include counsel's personal opinions and beliefs about the credibility of a witness or the guilt or innocence of the accused." *Phillips*, 144 Idaho at 86, 156 P.3d at 587. Accordingly, this Court has previously admonished prosecutors to avoid repeated use of the term liar. *Lankford*, 162 Idaho at 500, 399 P.3d at 827. Still, where the prosecutor's comments were supported by the evidence at trial, repeated use of the word liar has not been held

14

to constitute prosecutorial misconduct. *See id.* ("[A]lthough the repeated use of the term "liar" and its various grammatical forms is troubling and ill-advised, it did not rise to the level of prosecutorial misconduct").

At the outset we note that Herrera did not testify in this trial. His testimony from the first trial was read into the record.   Here, the prosecutor made numerous comments either explicitly saying or insinuating that Herrera had lied in various ways to various people over time:

1. The evidence shows that the defendant has lied. He has given inconsistent statements. He has given statements impossible with the physical evidence in forensic science. His statements are not to be believed.

2. It's as simple as 1+1 equals 2: A contact gunshot wound plus a lying defendant equals murder.

3. [T]he physical evidence alone proves a murder, but there is more than just physical evidence. There is the guilty conscience and lies of the defendant. You heard what the defendant had to say on Christmas day. It's an exhibit. You can listen to it again in the jury room.

4. When you evaluate the credibility of a witness, you can look to certain things. You can look and ask yourself: Does this person have a reason to lie? I submit to you that being charged with a crime is motivation to lie. You can look and see if they said any statements that are disproven by scientific fact. And then you can look to see have they changed their story over time, have they said one thing on one day and one thing on a separate day. If the answer's yes, they don't deserve credibility. The defendant has all three of those hallmarks. He is not worthy of any credibility.

5. It was a contact wound. [Herrera] said it was a distance away. He is not telling the truth. Innocent people do not lie. Guilty people lie.

6. Those are not minor inconsistencies in testimony; those are major contradictions in testimony. And those major contradictions are not the product of a faulty memory or a recollection enhanced over a year of time; that is the product of fabrication.

7. He has to create a new story in order to explain away the forensics. And that's exactly what he did; fabricate and lie.

8. The second story not only fails because it's an obvious fabrication meant to meet physical evidence, it fails to withstand the scrutiny of common sense and logic. Consider his statements closely.

15

9. I refer to the exhibit of the transcript – [Herrera's] second statement under oath . . . the question was put to the defendant, "Did she . . . see you take the clip out?" [Herrera] answers, "Yeah, I believe so. She was standing right there." Question: "If she sees you take the clip out, meaning the gun is made safe, why would she grab the gun then?" His answer is, "I don't know." He doesn't know because it's a fabrication.

10. Furthermore, consider his other statement critically, "I didn't want to go to the in-laws. So to make that point, I took a weapon and placed it against my head." . . . No; that is not a believable action. That is a fabrication, and the only one he could come up with to explain the contact gunshot wound. His statements cannot be believed.

11. [O]ver the course of this trial you've got to see a lot of cross examination. Cross examination and questions are designed to test witnesses. When somebody takes the stand, you can ask questions about details. And if somebody's not able to recall details, that suggests strongly that they either don't know what they're talking about or they're lying. The defendant had very convenient amnesia in this case.

12. It is very convenient for the defendant, when he is put to questions, to forget details. Now, yes, this might be a traumatic event, ladies and gentlemen, but traumatic events make things memorable.

13. His feigned ignorance is not the product of a memory faulty of time; that is the product of a fabrication, and answers he cannot fabricate quick enough to withstand the scrutiny of questioning. That tells you that he is not being truthful.

14. Consider, also . . . the family of the victim Stefanie showed up with guns and threatened to kill him. That would unsettle and unhinge somebody, especially somebody under the influence of meth. But just because they scream out, "I'm sorry. It's an accident," that doesn't make it true.

15. But more critically is [sic] consider the statements of the defendant to the first-responders. He didn't say, "Oh, she grabbed the gun and it went off." His statement . . . was "I was checking it to make sure it was clear and it went off." . . . His fabrications didn't start with Detective Berger in an interview room; they started as soon as the first-responders showed up. He was fabricating and lying in his fit of hysteria. And given his capacity for deceit, you should give his hysteria little credence as evidence of an accident.

16. Keep in mind, ladies and gentlemen, that in his fit of hysteria, he still maintained his lie; and that was nothing more than the effects of methamphetamine.

17. The physical evidence in this case is that of a contact gunshot wound. Physical evidence does not lie. Physical evidence does not get high on meth. Physical evidence does not tell inconsistent stories. Physical evidence can't be accused of murder and therefore have a motive to lie.

18. Physical evidence tells the truth, and the truth in this case is that it is a contact gunshot wound to the head. That is not an innocent act. That is murder. If you couple the physical evidence with the defendant's lies, deceit and omission, you arrive inexorably at the conclusion that this was murder.

19. So the defendant, by contradicting himself according to the standard that the defendant set, therefore he is lying. And what do both versions do for the defendant? The first one paints this as a tragic accident, "I'm not guilty." That's not the truth; it's been contradicted. His second version paints it also as a tragedy, "But I'm not guilty of murder," but it's contradicted by that first statement. Both of those statements aren't the truth. The truth is Stephanie had a gun pressed against her head and she died of a contact gunshot wound; and the defendant's lies are corroboration that he is guilty because innocent people do not lie. Guilty people lie because they have something to hide; the actions of murder.

20. I'm asking you to infer from the evidence, the guilty conscience and lies of the defendant, that he murdered her, because innocent people don't lie; guilty people do. If this was an accident, he would not have feared the truth and he would have told what happened.

These statements are certainly hard-hitting comments on Herrera's credibility. The prosecutor argued, either directly or through inference, that Herrera lied in the various stories he gave regarding the crime. We hold that the prosecutor's statements, when taken in context, are reasonable inferences based on evidence from trial. Similar to *Ehrlick*, the prosecutor did not engage in misconduct by commenting on Herrera's credibility; rather "the prosecutor explained how the evidence illustrated that [Herrera] was dishonest during the investigation and later at trial." 158 Idaho at 928, 354 P.3d at 490. Specifically, the prosecutor highlighted Herrera's inconsistent versions of what happened at the time Stefanie Comack died to argue that at least one story must have been false. Ultimately, when viewed in light of *Ehrlick* and *Lankford*, the prosecutor's statements did not cross the line into the realm of misconduct.

*The State did not misrepresent the law, the burden of proof, or the evidence.*

Next, Herrera asserts that the State committed prosecutorial misconduct by misstating the law, the burden of proof, and the evidence, by "repeatedly telling the jury that a contact gunshot wound and/or the lies of the defendant [were] sufficient to convict Mr. Herrera of second-degree murder." At the outset of the State's closing argument, the prosecutor set forth "[i]n order for you to find the defendant Joseph Herrera guilty of murder, the [S]tate must prove five elements beyond a reasonable doubt. . . . Those elements are as follows: On or about December 25, 2011, in the state of Idaho, the defendant Joseph Herrera, engaged in conduct which killed Stefanie Comack and in so doing, acted without justification or excuse, and that he acted with malice aforethought."

Generally, "both parties are given wide latitude in making their arguments to the jury and discussing the evidence and inferences to be made therefrom." *Ehrlick*, 158 Idaho at 928, 354 P.3d at 490. Still, the prosecution has a duty to avoid mischaracterizing or misstating evidence. *Id.* at 930, 354 P.3d at 492 (internal citation omitted). However, "comments intended to highlight the weaknesses of a defendant's case do not shift the burden of proof to the defendant where the prosecutor does not argue that a failure to explain them adequately requires a guilty verdict and reiterates that the burden of proof is on the government." *State v. Adamcik*, 152 Idaho 445, 482, 272 P.3d 417, 454 (2012). Here, during its rebuttal the State reminded the jury they had an instruction on what reasonable doubt was, and then represented that:

> reasonable doubt does not mean beyond all doubt. It does not mean mathematical certainty. It doesn't mean beyond the shadow of a doubt. That would be doubt subject to reason and common sense. Use your reason and your common sense in this case, and murder is clear.

The State's closing argument stemmed from the evidence and highlighted the weaknesses in Herrera's case, i.e., the fact that Stefanie Comack died of a gunshot wound to her forehead, coupled with the fact that Herrera told several versions of what happened, was compelling evidence of malice aforethought. We hold that the State did not misrepresent the law or reduce the burden of proof during closing arguments.

Herrera also alleges that the prosecutor misstated evidence and introduced facts not in evidence during closing arguments; namely, the prosecutor suggested that: Herrera was faking his reaction to the shooting in an attempt to show "evidence of his innocence," and there was "chaos" in the bedroom after the shooting.

18

"It is plainly improper for a party to present closing argument that misrepresents or mischaracterizes the evidence." *State v. Felder*, 150 Idaho 269, 274, 245 P.3d 1021, 1026 (Ct. App. 2010) (citing *State v. Troutman*, 148 Idaho 904, 911, 231 P.3d 549, 556 (Ct. App. 2010)). Further, "it constitutes misconduct for a prosecutor to place before the jury facts not in evidence." *Id.* (citing *State v. Gerardo*, 147 Idaho 22, 26, 205 P.3d 671, 675 (Ct. App. 2009)). However, a prosecutor is entitled to make "a fair comment based on logical inferences supported by the evidence." *Ehrlick*, 158 Idaho at 931, 354 P.3d at 493.

Herrera asserts that the prosecutor misrepresented the facts by telling jurors that Herrera's agitation had been caused by the influence of methamphetamine. Specifically, Herrera takes issue with the prosecutor's characterization of the testimony of Herrera's childhood friend, Daniel Ducommun, who testified that while methamphetamine amplified Herrera's emotional state, he had never seen Herrera act the way he had been acting on December 25, 2011. In the State's closing argument, the prosecutor characterized this testimony as follows:

> The defendant's own witness, his own friend of many years, testified that when the defendant is under the influence of meth, it amplifies his underlying emotional state. Do not let the Defendant's meth usage be misconstrued as evidence of innocence. He was under the influence of meth and he was agitated.

The prosecutor's statement was directly supported by the evidence, and the fact that he did not include Ducommun's later statement that he had never seen Herrera act the way he did on December 25, 2011, is not sufficient to demonstrate that the prosecutor mischaracterized the evidence. *Ehrlick,* at 928, 354 P.3d at 490 ("both parties are given wide latitude in making their arguments to the jury and discussing the evidence and inferences to be made therefrom.").

Herrera also asserts that the prosecutor falsely alluded to the jury that there was a lot of chaos in the bedroom. Specifically, Herrera condemns the following statement:

> [Defense counsel] claims that [Herrera] felt the firearm was empty, the magazine was out. Well, all you know is that the magazine was out. Perhaps it was popped out after there was blood on the floor, after the EMT's, people kicking stuff around. You don't know when that magazine was kicked out. There were two magazines that were recovered.

However, we conclude that this statement is a legitimate inference based on the evidence. *See Ehrlick*, 158 Idaho 928, 354 P.3d at 490. Further, despite Herrera's repeated references to "chaos" in his briefing, the prosecutor never made such a claim. Ultimately, the State is given wide latitude during closing arguments, and we hold that the State did not commit prosecutorial misconduct in its closing argument here.

19

**E. There is no cumulative error.**

Herrera asserts that even if the Court finds the aforementioned errors to be individually harmless, combined they amount to cumulative error. The State may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV; *see also* Idaho Const. art. I, § 13. This Court has interpreted the clause to "require states to ensure that criminal defendants' trials be fundamentally fair." *State v. Severson*, 147 Idaho 694, 715, 215 P.3d 414, 435 (2009) (citing *Schwartzmiller v. Winters*, 99 Idaho 18, 19, 576 P.2d 1052, 1053 (1978)). A trial does not need to be error-free to still be considered fundamentally fair. *Id.* Nonetheless,

> under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial. *State v. Martinez*, 125 Idaho 445, 453, 872 P.2d 708, 716 (1994). However, a necessary predicate to the application of the doctrine is a finding of more than one error. *See State v. Hawkins*, 131 Idaho 396, 407, 958 P.2d 22, 33 (Ct. App. 1998).

*Perry*, 150 Idaho at 230, 245 P.3d at 982. This Court has also recognized that it is "well-established that alleged errors at trial, that are not followed by a contemporaneous objection, will not be considered under the cumulative error doctrine unless said errors are found to pass the threshold analysis under our fundamental error doctrine." *Id.*

The only error found was the admission of a portion of Detective Berger's testimony, which we held to be harmless; therefore, the cumulative error doctrine does not apply. *See Hawkins*, 131 Idaho at 407, 958 P.2d at 33 ("a necessary predicate to the application of the doctrine is a finding of more than one error.").

**F. The district court judge's comments do not substantiate a claim that he vindictively sentenced Herrera for exercising his right to appeal.**

At the outset of Herrera's sentencing hearing, the district court judge (who was not the original trial judge) issued an apology for the mistakes made in the first trial, stating:

> It is incredibly unfortunate that we're here again today because this is obviously an emotionally-packed case, has been since it occurred, still is nearly five years later and will be for many people's entire lives.

> The fact that we will have to retry that and pick apart at [sic] those old wounds is extremely unfortunate . . . and I apologize to the parties, to you who are watching, you who are here on either side because this shouldn't have had to happen.

After listening to victim impact statements and recommendations from counsel, the judge admonished Herrera for not "com[ing] forward with what actually happened" based on the

20

inconsistent stories presented throughout trial. Ultimately, the judge applied the *Toohill*[1] sentencing factors, (1) protection of the public; (2) rehabilitation; (3) punishment; (4) deterrence, and sentenced Herrera to an indeterminate life sentence with thirty-years fixed. Herrera argues the district court imposed a vindictive sentence by increasing his sentence from twenty-two years fixed to thirty-years fixed.

Herrera did not object at the time of trial; therefore, we review the judge's sentencing decision for fundamental error. "[A] violation of the right to be free from a vindictive sentence is fundamental because it goes to the foundation or basis of a defendant's rights." *State v. Baker*, 153 Idaho 692, 695, 290 P.3d 1284, 1287 (Ct. App. 2012) (citing *State v. Robbins*, 123 Idaho 527, 529, 850 P.2d 176, 178 (1993)). This Court has held that the imposition of a heavier sentence following retrial violates due process if the motivation for the heavier sentence was to punish the defendant for getting the original conviction set aside. *Robbins*, 123 Idaho at 530, 850 P.2d at 179 (citing *North Carolina v. Pearce*, 395 U.S. 711, 726 (1969)). Therefore, "[t]o protect a defendant from retaliatory motivation, the Court held that 'whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for [the judge's] doing so must affirmatively appear.'" *Id*. This rule has been read to "[apply] a presumption of vindictiveness, which may be overcome only by objective information in the record justifying the increased sentence." *Id*. (citing *United States v. Goodwin*, 457 U.S. 368, 374, (1982)).

However, "[a] presumption of vindictiveness in sentencing only applies where the defendant has successfully appealed a conviction and received a greater sentence *by the same district court* after a retrial or remand." *Baker*, 153 Idaho at 695, 290 P.3d at 1287 (emphasis added). Absent the presumption, the defendant must show actual vindictiveness. *Robbins*, 123 Idaho at 532, 850 P.2d at 181 (citing *Wasman v. United States*, 468 U.S. 559, 569 (1984)). We examine the totality of the circumstances and the entire record of the case to determine whether a district court has imposed a vindictive sentence. *State v. Brown*, 131 Idaho 61, 72, 951 P.2d 1288, 1299 (Ct. App. 1998).

Here, there is no presumption of vindictiveness because the second trial was before a new judge; thus, Herrera must prove that his sentence was a result of actual vindictiveness. He has failed to do so.

---

[1] *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App. 1982).

The sentencing judge made repeated references to Herrera's purported lack of closure in this case:

> The difficulty here in this case is that no one in this courtroom right now has closure, and a part of that is due to what happened in the first trial because of an attorney's decision, and that's hugely unfortunate, but right now there's nobody on my right side of the room that has closure because nobody in this courtroom, your family included, know what happened.

> . . . . Knowing what happened could help everybody here in this courtroom go a long way to speeding up the healing process. This will never be -- nobody in this room will ever be made whole because of what you did on December 25, 2011, but knowing what happened, even if it's closest to the worst possible humanly imaginable situation, is better than not knowing what happened, and because of the amount of stories that you've told, they don't know what happened, your family doesn't know what happened, I don't know what happened. I'm going to talk about what I do know. And not making that statement today is not only affecting their lack of closure, but it's your showing a lack of responsibility, accountability.

> . . . .

> Here's what I can't figure out and why I'll never have closure and nobody in this room will. Your mother, I believe if I recall correctly, testified that she heard nothing upstairs, no argument, no screams, no things being knocked off the shelf, and I don't know what her ability to hear was at the time, and there's testimony that the reason Stefanie Comack was shot by you was because there was a disagreement . . . over where you're going to go for Christmas to open presents. If that's the truth, you should go to prison for the rest of your life. There's no way you can convince me and I would think any judge that a different outcome should await murder as the response to an argument as to where we go for Christmas morning. I mean that's so sick and twisted that I don't even -- I can't get my mind around it.

> . . . .

> It's been five years, two months from now, since the murder, and you as I indicated before, haven't come forward with which of the stories is right, true, the truth, if any of them.

> . . . .

> I do want to make a finding -- so the most troubling thing to me is that we don't know – and I already said that -- we don't know what happened, and you're not going to tell us. You haven't been emotional, and I will make a finding that you haven't been emotional while you're here. . . . I just wanted to make that finding. It has very little to do with my decision.

> The greatest thing that impacts my decision compared to Judge Gibler's decision is a couple more years have ticked on and we still don't know what

happened the morning of December 25, 2011, and that's the way it will remain forever.

As I said at the outset, the fact that this had to be retried by its very nature keeps the wound open, and that's sad.

When these comments are viewed in the totality of the circumstances, we conclude that the references to a "lack of closure" stem from Herrera's failure to come forward with what actually happened to Stefanie Comack, not from Herrera going through a second trial after successfully exercising his right to appeal. A trial court does not err by considering a defendant's lack of remorse at sentencing, whether after a jury trial, *State v. Stevens*, 146 Idaho 139, 148, 191 P.3d 217, 226 (2008) (the district court did not violate the Fifth Amendment or abuse its discretion by considering Stevens's failure to take responsibility for his actions when fashioning the sentence) or after taking an *Alford* plea. *See State v. Baker*, 153 Idaho 692, 696, 290 P.3d 1284, 1288 (Ct. App. 2012) (trial court did not err in considering defendant's lack of remorse at sentencing after taking an *Alford* plea). Further, Herrera has not established that any error "plainly exists" in the record. *See Perry*, 150 Idaho at 228, 245 P.3d at 980. Instead, the record reflects that district court judge was troubled by Herrera's failure to take responsibility. Herrera has failed to prove that the district court judge's comments stemmed from Herrera exercising his right to appeal. Consequently, we hold that Herrera failed to establish that he was subjected to a vindictive sentence.

## VI. CONCLUSION

Herrera's conviction and sentence for second-degree murder are hereby affirmed.


Chief Justice BURDICK and Justices HORTON, BRODY and Justice *pro tem* NORTON, CONCUR

23